In re GRANT BROADCASTING OF PHILADELPHIA, INC. (Jointly administered with Grant Broadcasting System, Inc., Channel 33, Inc., and Grant Broadcasting of Chicago, Inc., and Grant Broadcasting of Chicago Limited Partnership), Debtors.

Bankruptcy No. 86–05614S.

United States Bankruptcy Court, E.D. Pennsylvania.

March 24, 1987.

Marc J. Sonnenfeld, Jami Wintz McKeon, Philadelphia, Pa., for debtors.

Nathan B. Feinstein, Lawrence G. McMichael, Philadelphia, Pa., for Secured Noteholders.

Howard Glassman, Leon Forman, Philadelphia, Pa., for Programmers.

Susan L. Thorner, Hughes, Hubbard & Reed, New York City, Doron A. Henkin, Philadelphia, Pa., for Viacom.

Mary Walrath, Philadelphia, Pa., for Creditors' Committee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

Perhaps the most distasteful of the numerous Motions before the Court in the course of the administration of these five (5) jointly-administered cases is a dispute between two (2) law firms as to which creditors should be deemed to be members of the "official" Committee of unsecured creditors in this case and as to whether each or both of these firms should be designated as counsel for the "official" Creditors' Committee in this matter. Our concern for fiscal economy in the administration of Chapter 11 cases causes us to reject, at least at this juncture, the alternative of appointing two (2) Committees and allowing each opposing firm to serve as counsel for one. Being thus inclined to form one Committee, we are appointing thereto all of the thirteen (13) creditors initially named to the Committees who have indicated a desire to be appointed, either by filing an express acceptance of appointment or by joining in a Motion before us to formulate a single Committee. We believe that only one of the firms requesting to be appointed as counsel to the Committee is eligible for such an appointment, because the other firm is simultaneously representing some of the unsecured creditor entities in advancing interests adverse to those of at least some of the other unsecured creditor entities. We therefore appoint the only potential eligible firm as Counsel from the date of their application to date, although we recognize that the Committee, as consti-

tuted, may decide to replace that firm with some third firm as counsel.

The Debtors in these matters, all of whom are proceeding under Chapter 11 of Title 11, U.S.Code, are (a) Grant Broadcasting of Philadelphia, Inc. (hereinafter referred to as "Grant/Phila."); (b) Channel 33, Inc. (hereinafter referred to as "Grant/Miami"); (c) Grant Broadcasting of Chicago, Inc. (hereinafter referred to as "Grant/Chicago"); (d) Grant Broadcasting of Chicago Limited Partnership (hereinafter referred to as "the Partnership"); and the parent of the foregoing, (e) Grant Broadcasting System, Inc. (hereinafter referred to as "GBSI").

Grant/Phila. owns and operates Channel 57, WGBS–TV, in Philadelphia. Grant/Miami owns and operates Channel 33, WBFS–TV, in Miami. Grant/Chicago is the general partner of the Partnership, the latter of which owns Channel 66, WGBO–TV, in Chicago; Grant/Chicago operates this station. All of these stations are independent UHF television stations.

Grant/Phila., Grant/Miami, and Grant/Chicago filed their bankruptcy Petitions on December 8, 1986. GSBI filed on December 10, 1986. The Partnership subsequently filed on January 27, 1987.

It is the practice in this Court to issue a form Order of Appointment of Committee of Unsecured Creditors immediately after the filing of any and every Chapter 11 case. Pursuant to §§ 1102(a)(1) and (b)(1), the Clerk's Office ministerially copies the names of the seven (7) largest (or less if there are not seven (7) named) unsecured creditors appearing on the debtor's schedules and indicates, on the form Order, that these entities are tentatively appointed to the Creditors' Committee. However, the Order also states "that each creditor shall, within 10 days of the date of this Order, inform [the Deputy-in-Charge of Bankruptcy Operations, giving his address] of its acceptance or declination of the above appointment." On the bottom of the Order itself, which is sent to the appointee, is a space where the appointee can designate its acceptance or declination right on the form, set forth its name and/or the name of its

business, have an authorized person sign same, and remit the form.

On December 8, 1986, this Court, acting in the ordinary course, thus signed Orders tentatively appointing the Committees for each of the Debtor stations. All of the creditors named on each of these Orders were entities which sold programming to each Debtor station, who are unsecured creditors referred to hereinafter collectively as "the Programmers." Four (4) of the Programmers, Columbia Pictures International, MGM/UA TV Distributors, Paramount Pictures Corporation, and Viacom International, Inc., were named in each Order. Embassy Telecommunications and Twentieth Century Fox Communications were named on only the Chicago and Miami stations' Orders; Warner Brothers Distributors on only those of Philadelphia and Miami; and Lorimar Telepictures and MCA Television Ltd. on only those of Philadelphia and Chicago.

However, the Order relating to GBSI, entered on December 11, 1986, included a quite different line-up of unsecured creditors: Arthur Andersen & Co.; Touche Ross & Co.; McFeeley, Wackerle & Associates; Stephen Douglas Associates; Broadcast Cable Associates; Haff-Dougherty Graphics, Inc.; and Miami Lakes Travel.

Express acceptances of tentative appointments to the various Committees were filed, in all of the cases combined, by only the following creditors: Viacom International, Inc., MCA Television Ltd., Stephen Douglas Associates, Broadcast Cable Associates, Haff-Dougherty Graphics, Inc., and Miami Lakes Travel.

We also note that, on January 28, 1987, we signed a similar Order in the Partnership's case. Named to this Committee were Viacom International, Inc., Lorimar Telepictures, Twentieth Century Fox Communications, MGM/UA Entertainment, Embassy Telecommunications, Paramount Pictures Corporation, and Orion Pictures. As of this date, the only creditor named to this committee to expressly respond was Orion Pictures, which accepted its appointment.

On January 20, 1987, out of the group of Programmers named above, the following, joined by several other Programmers not named on any Orders, filed a Motion "for Order Appointing One Committee of Unsecured Creditors, Vacating Prior Orders Appointing Committees, and Application for Approval of Selection of Blank, Rome, Comisky & McCauley (hereinafter referred to as "Blank, Rome") as Attorneys" and a Motion for an Expedited Hearing on this Motion: CPT Holdings, Inc. (which we understand is an entity related to Columbia Pictures International), Embassy Communications, Lorimar Telepictures Corporation, MCA Television, Ltd., MGM/UA Television Distribution, Paramount Television Domestic Distribution, Inc. (an entity apparently related to Paramount Pictures Corporation), Viacom International, Inc., Twentieth Century Fox Telecommunications, and Warner Brothers TV Distributors. Signing the Motion as Chairperson of "the Committee of Unsecured Creditors of the Debtors" was one Robert Hadl, whom we presume is associated with one of the Programmers. We shall refer to this prospective Committee as "the Programmers Committee." This Motion was scheduled for a hearing on February 3, 1987.

Unfortunately, colliding, as it were, in mid-air with this Motion was an Application for Appointment of Counsel to Official Unsecured Creditors' Committee filed on January 21, 1987, by another law firm, Clark, Ladner, Fortenbaugh, and Young (hereinafter referred to as "Clark, Ladner"). The signatory of the Clark, Ladner Application, as "Chairman of the Creditors' Committee," was one Steven Sadaka, who we later learned is the President of Stephen Douglas Associates, one of the entities listed as a tentative appointee on the GSBI Order only. The entities named in that Order will be referred to collectively as "the Trade Creditors," and this prospective committee as "the Trade Creditors Committee."

The dispute between the two Committees and their respective counsel was first brought to our attention on the morning of January 23, 1987, during the course of the Consolidated Hearing on the Debtors' Motion to use Cash Collateral and a Motion for Relief from the automatic stay filed by certain secured investors in the Debtor stations who are designated herein as "the Secured Noteholders."[1] Needing all of our court time to devote to the Consolidated Motions, we advised the contesting Committees and their respective counsel that we would hear their counter-Motions together with other relatively small matters on February 3, 1987, the date when the Motion filed by Blank, Rome was already scheduled for a hearing.

While we do not intend to recite all of the Motions which have descended upon us in this case,[2] we do consider it significant to our decision on the instant Motion to note that all of the Programmers named above except Viacom International, Inc., Orion Pictures, and Warner Brothers TV Distributors, plus two other Programmers doing business with the Debtor stations, Republic Pictures Corporation and Buena Vista Television, have joined into a Motion, originally filed on January 16, 1987, to Compel Assumption or Rejection of Exclusive Licensing Agreements; to Compel Debtors to Make Administrative Payments; for Adequate Protection and Relief from the Automatic Stay. This Motion seeks to have all of the post-petition charges due to the Moving Programmers under their various contracts paid as they come due on the basis that they are entitled to such payments as allowable administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A), and alternatively, because such payments are necessary to adequately protect their interests pursuant to 11 U.S.C. § 363(e). Testimony was taken on this Motion on February 9, 1987. Briefs were filed in opposition to this Motion, the last of which trickled in on March

---

1. For a complete recitation of the volley of Motions and description of parties before the Court in these cases, reference is made to pages 1–3 of our Opinion of March 2, 1987, addressing the Consolidated Motions.

2. Again, reference is made to our Opinion on the Consolidated Motions of March 2, 1987, at pages 1–3 for a complete recitation of all of the major Motions before us in these matters.

11, 1987, by not only the Debtors, but also from the Secured Noteholders and the Trade Creditors.

In one of the most unpleasant moments of these extended proceedings, both Mary F. Walrath, Esquire, of Clark, Ladner, and Howard T. Glassman, Esquire, of Blank, Rome took the stand on February 3, 1987, to justify their own actions and swap accusations of unethical conduct against the other. Most of the controversy swirled around counter-allegations of efforts by each attorney to speak to a creditor represented by the other. However, before becoming embroiled in these controversies about communications with the other's clients, Ms. Walrath presented the Docket Entries in the GBSI case, indicating that four Trade Creditors, Haff-Dougherty Graphics, Inc., Broadcast Cable Associates, Stephen Douglas Associates, and Miami Lakes Travel had expressly accepted Committee appointments. Examination of the Grant/Phila., Grant/Chicago, and Grant/Miami Dockets indicated that only Viacom International, Inc. had accepted an appointment in each case, and that the only other party to accept an appointment in these cases was MCA Television Ltd., which had accepted appointments in the Philadelphia and Chicago cases. Moreover, Viacom had, from the onset of the matter, been represented by its own counsel who, at the close of these proceedings, indicated that her client would not serve on any committee if a Settlement Agreement negotiated with the Debtors was approved by this Court. On February 26, 1987, we did approve the Settlement Agreement, supporting this decision with the second of two (2) Opinions which we filed in this case on March 2, 1987. Hence, we conclude that Viacom is no longer a candidate for Committee appointment.

Mr. Glassman began the testimony in these proceedings by giving testimony about a telephone conversation between Mr. Sadaka and himself on that very morning of February 3, 1987, well after Mr.

Glassman had received a copy of the Clark, Ladner Application on which Mr. Sadaka was the signatory for the Trade Creditors' Committee, and after the contest of his firm with Clark, Ladner had become manifest. Hearing him out despite hearsay objections on which we reserved our ruling as to admissibility, we were told by Mr. Glassman that Mr. Sadaka advised him that Ms. Walrath had told him (Mr. Sadaka) that the Programmers were secured creditors and that, unless Mr. Sadaka and the other creditors opposed their efforts, his company would get nothing. Further, Mr. Glassman stated that, after he (Mr. Glassman) so enlightened Mr. Sadaka, Mr. Sadaka indicated that he wanted nothing further to do with this matter and did not consider himself to be represented by Ms. Walrath or Clark, Ladner.

Ms. Walrath then was called as a witness by Blank, Rome. She testified that, having been contacted by Manheim Advertising, a Trade Creditor not appointed to any Committee, to investigate its likelihood of a recovery in these cases generally, she had checked the Court dockets, noted the parties who had accepted Committee appointments, and attempted to contact each of them to ascertain whether they wished to hire Clark, Ladner as their counsel. In so doing, Ms. Walrath apparently was the catalyst in the scheduling of a telephonic conference meeting the next day among the four (4) Trade Creditors which had accepted appointments in the GSBI case, who selected, not surprisingly, Clark, Ladner as their counsel. In response to accusations of Mr. Glassman that she had attempted to communicate with his clients, Ms. Walrath testified that she had called the office of California counsel of MCA Television, Inc., who had entered his appearance for that party, to determine whether that party, who alone among the Programmers represented by Blank, Rome had accepted an appointment,[3] wished Clark, Ladner to represent it, which was answered negatively.

---

**3.** Neither attorney made mention of, and neither could have been aware of, the fact that Orion Pictures would proceed to expressly accept its appointment to the committee appointed in the Partnership case, since the acceptance of this party did not appear on the docket until after the hearing on February 9, 1987. There is no indication of whether the Orion Pictures is

We must express some dismay that Mr. Glassman and Ms. Walrath were unable to resolve this matter between themselves. Rather than attempting to communicate with each other to attempt to resolve what may well have been a simple misunderstanding, they resolved to lock horns and compelled the Court to take valuable time from an important case to resolve their squabble, which appears, at its core, to be a contest over which firm will be awarded the plum of payment of its counsel fees from the Debtors' potentially sizable estate rather than from their clients. It is the presence of this sort of prominence to fee matters which causes some bankruptcy courts to be held in low esteem by many creditors, who perceive our Courts as servants of the interests of the bankruptcy bar rather than the interests of debtors and creditors.

With respect to Clark, Ladner and Ms. Walrath, we cannot find that her conduct was in any sense inappropriate. There is a suggestion that she may have rather aggressively solicited and "organized" parties with a relatively insignificant interest in the case solely to obtain the brass ring of appointment as Counsel for the Creditors' Committee. We hazard a prediction that any Clark, Ladner fee request may well exceed by far the total claims of $28,000.00 of the creditors who hired Clark, Ladner. However, we may limit the impact of this factor by, in the exercise of our discretion, scaling fee awards to the amount of the claims in issue. More important, however, is an inherent lack of reality in Clark, Ladner's suggestion that the Trade Creditors, whose claims, relative to those of the Programmers, are miniscule should be entitled to constitute a majority voice on the official Creditors' Committee in preference to or in parity with claimants owed about 1,000 times more than they. This suggestion is out of sync with the Code's eminently logical directive that the Creditors' Committee "shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor...." 11 U.S.C. § 1102(b)(2). *See, e.g., In re Salant Corp.,*

53 B.R. 158, 160–62 (Bankr.S.D.N.Y.1985) and *In re Daig Corp.,* 17 B.R. 41, 42–43 (Bankr.D.Minn.1981). (Claimants with most substantial monetary claims are entitled to representation).

On the other hand, we cannot be quite so charitable in our assessment of the conduct of Blank, Rome and Mr. Glassman. The Code of Professional Responsibility provides, at Disciplinary Rule (DR) 7–104(A)(1), as follows:

> (A) During the course of his representation of a client a lawyer shall not:
>
> (1) Communicate or cause to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

■ We believe that Mr. Glassman's conversation with Mr. Sadaka represented a violation of this Rule. We are not impressed with Mr. Glassman's explanation that this communication is exempted from constituting a violation of this Rule by the fact that he was returning a call made to him by Mr. Sadaka, which it developed was made to him over a week prior to February 3, 1987. We believe that, irrespective of who initially called whom, it was a violation of Disciplinary Rule 7–104(A)(1) for Mr. Glassman to speak to Mr. Sadaka at all, and especially to attempt to "advise" him that his counsel had misled him. Our local district Court has, in two recent opinions, expressed its extreme dissatisfaction with attorneys who violated this Rule to any degree. *See Haffer v. Temple University, etc.,* C.A. No. 80–1362 (E.D.Pa., Opinion filed March 2, 1987) (per LORD, S.J.) [Available on WESTLAW, DCTU database] (Defendants sanctioned with, *inter alia,* fine of $7,500.00 for their counsel's distribution of memo to Plaintiff class members and encouragement of his client to communicate with class members); and *Skloff v. Bickley,* C.A. No. 85–5555 (E.D.Pa., Memo. filed Feb. 26, 1987) (per BRODERICK, J.)

---

represented by counsel, and neither the identity of this party nor the identity of its counsel ever

came up at any time in the course of the lengthy proceedings in these cases.

[Available on WESTLAW, DCTU database] (Attorney disqualified for sending copy of letter deprecating advocacy of previous opposing counsel to the opposing parties themselves). We join our brethren in condemning such conduct here. While Mr. Glassman's single verbal communication with Mr. Sadaka is in itself less outrageous than the conduct sanctioned in those cases, and causes us to refrain from imposing any sanctions other than our findings on this point, the nature of the impropriety of Mr. Glassman's conduct is heightened by his testimony and the arguments of Blank, Rome in their Briefs which ask us to overlook the rather obvious impropriety by arguing that this conversation was not only perfectly proper, but should be a proper source of evidence against the contention of Clark, Ladner or Ms. Walrath that they should properly serve as counsel for the Creditors' Committee in this case.

With respect to Mr. Sadaka's testimony, we believe that it *is* hearsay and inadmissible. See Federal Rule of Evidence 804(b)(3). In no sense should information gleaned from a contract which is violative of DR 7–104(A)(1) be deemed an "admission against interest." To so characterize it would be to improperly sanction counsel's engaging in the most invidious sort of communications prohibited by DR 7–104(A)(1).

Moreover, even if we considered this testimony, it would not change our result. We doubt very much that Mr. Sadaka understood the technical points of bankruptcy law discussed with him by Mr. Glassman, and hence a second-hand recitation of Mr. Sadaka's alleged responses to same are worth virtually no weight in proving any express misrepresentations on the part of Ms. Walrath.

Given the potential that this entire controversy presents to cause our Court to be held in a bad light by giving prominence to what is essentially a secondary matter mostly relevant to fees, there is one issue about which we, joined by the Secured Noteholders, who filed a Brief to make this point alone, are clear. We are not going to open ourselves to the otherwise justifiable

criticism that we allowed two firms to tax the Debtors' estate, at the ultimate cost to the Debtors and the creditors, by appointing two Creditors' Committees, just because they could not resolve a squabble between themselves and because we found the matter difficult to resolve. We totally agree with the observation of Judge King of this Court in *In re Shaffer-Gordon Associates, Inc.*, 40 B.R. 956, 958 (Bankr.E.D. Pa.1984), that appointment of multiple Creditors' Committees should be the rare exception, because it is not the function of such a committee " 'to provide a Court sanctioned spokesman, at the cost and expense to the estate, to protect and advocate the interests of creditors in aserted rights against third persons. This can be done, if necessary, by individual creditors on their own behalf.' " *See also In re Johns-Mansville Corp.*, 68 B.R. 155 (S.D.N.Y.1986) (no official committee appointed where one was not necessary); and *Salant Corp., supra* (multiple committees not warranted, expansion of single committee preferred). We should also add that this matter presents a glimpse at what appears to be the dark side of the issue of Creditors' Committee involvement in Chapter 11 cases, which confirms our instinct that we should be conservative in compensating committee members and professionals hired by them. *See In re Jennings*, 67 B.R. 106 (Bankr.E.D.Pa. 1986). *Accord: In re Mesta Machine Co.*, 67 B.R. 151, 163–64 (Bankr.W.D.Pa.1986); *In re Automotive National Brands, Inc.*, 65 B.R. 412 (Bankr.W.D.Pa.1986); and *In re Windsor Communications Group, Inc.*, 54 B.R. 504 (Bankr.E.D.Pa.1985). *Cf. In re National Paragon Corp.*, 68 B.R. 337, 341 (Bankr.E.D.Pa.1986) (bankruptcy courts must be sensitive to criticisms of political patronage and contentions that they serve lawyers, not creditors).

We therefore believe that appointment of one Creditors' Committee is sufficient and entirely appropriate here. As we point out at page 664 *infra*, we are sensitive to the fact that the members of a Creditors' Committee have a fiduciary duty to represent the interests of all creditors, and hence it is important to make certain

that they are representative of *common* creditors' concerns. However, if and only if it becomes obvious that members of the Committee are placing self-interest ahead of their fiduciary duty would be consider appointing another Committee or replacing creditors otherwise entitled to be members of the Committee.

However, having made this decision, we are presenting ourselve with a difficult decision in determining how the single Creditors' Committee is to be formed and what counsel should represent it. We would also be unfair if we did not state that, putting aside our displeasure with the conduct of both of these firms in escalating this aspect of the case to untoward prominence, we did not state that these firms, and Mr. Glassman and Ms. Walrath in particular, have, in the substance of their advocacy on the other relevant and important issues in these cases, displayed a high degree of competence and professionalism. They have contributed helpful Briefs and argument which we relied upon in deciding the Consolidated Motions. Both would undoubtedly continue to assist us in reaching just decisions in this matter in the future if they continue to actively participate. This is of course the bright side of Creditors' Committee involvement, and there is much positive to say about this element in this case also.

However, there is another Code provision and significant element which we must consider in determining whether Blank, Rome may be appointed as counsel for the Creditors' Committee, set forth as follows in 11 U.S.C. § 1103(b):

(b) An attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

■ This Code provision, previous to the 1984 amendments effected by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353 (BAFJA), read as follows:

(b) A person employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity in connection with the case.

Over the objection of the National Bankruptcy Conference, an organization of bankruptcy judges, law professors, and practicing attorneys, expressed in a Statement by its most respected Vice-Chairman, see *Statement of George M. Treister on Behalf of the National Bankruptcy Conference in Opposition to H.R. 3949 Before the Subcommittee on Monopolies and Commercial Law of the House Committee of the Judiciary, July 23, 1981,* this amendment weakened the absolute prohibition of simultaneous representation by counsel (1) for a Creditors' Committee and (2) for any creditors in a matter adverse to the interests of other creditors in the case. However, weakened as it was, the Amendment did not alter the prohibition of dual representation of an individual creditor and the Creditors' Committee if the individual creditor in fact did hire such counsel to litigate issues potentially adverse to other Committee members.

In *Mesta Machine, supra,* Chief Bankruptcy Judge Joseph L. Cosetti of the Western District of Pennsylvania commented at length on the duties of professionals employed by a Creditors' Committee. Citing Supreme Court authority, Judge Cosetti held that such professionals are "fiduciaries ... [who] must have undivided loyalty to those whom they represent without any conflict of interest." 67 B.R. at 156–57. *See also id.* at 158. The amended version of § 1103(b) is thus held by him to continue to be "designed to prevent potential conflicts of interest, and to avoid even the appearance of impropriety." *Id.* at 157.

■ Blank, Rome is vigorously representing the Programmers in pressing the Motion described at page 658 *supra,* which urges that the claims of the Programmers joining the Motion are entitled

to have their contracts with the Debtor stations be currently paid in full by the Debtors. It is obvious that this position, if sustained, is adverse to the interests to all of the other creditors of the Debtors, including Viacom and the Trade Creditors. The cash flow of the Debtors appears insufficient to pay all of the Programmers in full under the contracts, and therefore requiring such payments from the Debtors will diminish their resources available to other creditors and significantly increase the burdens of the Debtors to successfully reorganize and equitably compensate all of their creditors. Therefore, we must conclude that Blank, Rome is already representing an interest adverse to at least some of the Debtors' other creditors and that, therefore, by the terms of 11 U.S.C. § 1103(b), even as amended, that firm cannot be appointed as counsel to the Creditors' Committee. We should also observe that we anticipate that the Programmers themselves will continue to retain Blank, Rome, as their counsel, as they have done to date, irrespective of the outcome of these Motions. Therefore, we are very likely to be left with the happy result of having the benefit of that firm's high-quality representation to assist us in any event.

On the other hand, there is no conflict present in the representation of the Creditors' Committee by Clark, Ladner. We therefore recognize Clark, Ladner as counsel for the Creditors' Committee from the date of their application, on January 21, 1987, to date.

However, it is still necessary for us to resolve the issue of composition of the Official Creditors' Committee at present. It is of course up to the constituents of the Committee to decide whether to retain Clark, Ladner as the Committee's counsel, or to replace it. We do note that, from our vantage point, we would greatly welcome the continued participation of Clark, Ladner, and the continuity of the high-quality of representation provided by that firm to date, which has, like that of Blank, Rome, been of great assistance to us. However, this is not our choice to make. Our only duty is to direct which creditors shall be deemed members of the Official Creditors'

Committee, who in turn may appoint any firm with which no conflict in representation appears, per 11 U.S.C. § 1103(b), as their counsel.

■ First, we must recognize that the four Trade Creditors, as monetarily small as their interests might be relative to those of the Programmers, are entitled to Committee membership, as they were tentatively named as Committee members and they did strictly comply with our Orders to accept or decline their appointments to committees by filing acceptances. We recognize, as Blank, Rome points out in its Briefs, that the form Orders sent out to prospective committee members are not produced in accordance with any Code provision or national or local Rules. We would never sanction a creditor for not responding, and we agree with Blank, Rome's observation that the failure to either accept or decline the invitation to serve on a committee, by all of the Programmers except Viacom International, Inc., MCA Television Ltd., and Orion Pictures, is at best an ambiguous expression of intent.

However, we also must observe that these Orders *are* nevertheless valid court orders, and their function is to promote an orderly process, as opposed to a cacophony of different contentions of right to Committee membership which might otherwise arise, as indeed happened here. Had no other creditors responded to our Orders, we doubtless would have allowed the tentative appointments to the Committees effected by our original Orders to remain in place. However, other creditors *did* respond, and it would be contrary to the sanctity of our own Orders to give non-responding Programmers priority on committee membership over creditors who did as they were ordered, and responded affirmatively. Clearly, by failing to act, the Programmers did so at the peril that others *would* act and would replace them as permanent committee members.

■ We also note that the Trade Creditors' Committee has made a record of a formal meeting and election which is ab-

sent from the record made by the Programmers Committee. We quite agree with Clark, Ladner that a conference-call Creditors' Committee meeting was, under the circumstances, practical and acceptable, especially in light of our reluctance, per the *Jennings* Opinion, to allow reimbursement for travel expenses to Creditors' Committee members.

We do acknowledge that the Programmers, represented by Blank, Rome, have appeared in this case from its inception. However, it is also apparent that the Programmers proceeded to do so on their own, without any expressed need to formalize the legitimacy of their so doing as members of an official Creditors' Committee.

On the other hand, we believe that it would constitute too great of an enhancement of formality at the expense of practicality to consider joinder in the Blank, Rome Motion before us by the Programmers who were tentatively appointed to the Creditors' Committees as per our original Orders as anything less than an acceptance of their appointment to the Committees. The failure to act within ten (10) days, as per our Orders, has, in our view, only the effect of assuring those that did comply within that time limit a spot on the Committee, in addition to the Programmers that belatedly indicated their acceptance by joining in the Blank, Rome Motion before us.

We recognize that our decision as to the make-up of the Official Creditors' Committee will result in a Committee with more than the classic seven (7) members. See 11 U.S.C. § 1102(b)(1). However, the Code expressly implies that some flexibility in size is appropriate, and a Committee containing as many as twenty (20) members was appointed in *Salant Corp., supra.*

We therefore feel perfectly comfortable in appointing, as members of the Official Creditors' Committee, the four Trade Creditors who expressly accepted appointments, the two Programmers who did so, and the seven Programmers, other than Viacom, who joined Blank, Rome's Motion in issue. This leaves us with a thirteen (13)-member Committee consisting of the following parties: MCA Television, Ltd., Orion Pictures, Stephen Douglas Associates, Broadcast Cable Associates, Haff-Dougherty Graphics, Inc., Miami Lakes Travel, CPT Holdings, Inc. (Columbia Pictures International), Embassy Communications, Lorimar Telepictures Corporation, MGM/UA Television Distribution, Paramount Television Domestic Distribution (Paramount Pictures Corp.), Twentieth Century Fox Telecommunications, and Warner Brothers TV Distributors.

Having numerically weighted the membership of the Committee in favor of the Programmers, who are presently pressing a Motion which, although they have a perfect right to press, we believe is adverse to the interests of other creditors, we think it is appropriate to express our position of the duties which are impressed upon the Programmers appointed to the Committee, in common with all Creditor Committee appointees in any case. Like counsel to Creditors' Committees, committee members are "fiduciaries" who "have obligations of fidelity, undivided loyalty and impartial service" to the interests of *all* creditors in their actions in their capacities as Committee members. *Mesta Machine, supra,* 67 B.R. at 156. *See also, e.g., Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, 268–69, 61 S.Ct. 493, 497–98, 85 L.Ed. 820 (1984); *In re Johns-Manville Corp.,* 26 B.R. 919, 924–26 (Bankr.S.D.N.Y.1983); and A. DeNatale, *The Creditors' Committee Under the Bankruptcy Code—A Primer,* 55 AM.BANKR.L.J. 43, 56–58 (1981).

However, unlike professionals employed by the Committee, there is no prohibition as there is in § 1103(b) against an entity's serving on a Creditors' Committee which has an interest adverse to other creditors. Indeed, if there were, many otherwise eligible committee members would be disqualified. We have no reason to anticipate that the Programmers who are appointed members of this Committee will not appreciate their fiduciary duties as Committee members, and perform them well. Only if it is established that they have breached these duties would we consider appointing another Creditors' Committee or in any way altering the composition of the

Committee which we have, after much consideration, formulated.

We shall therefore enter an Order vacating our prior Orders appointing five (5) separate Creditors' Committees in these cases; recognizing the thirteen (13) entities set forth above as members of the Official Creditors' Committee; and granting Clark, Ladner's Application to employ it as Counsel for the Committee.