In re **GRANT BROADCASTING OF PHILADELPHIA, INC. (Jointly administered with Grant Broadcasting System, Inc., Channel 33, Inc., Grant Broadcasting of Chicago, Inc., and Grant Broadcasting of Chicago Limited Partnership), Debtors.**

Bankruptcy No. 86–05614S.

United States Bankruptcy Court, E.D. Pennsylvania.

March 30, 1987.

named the depository must deliver it to the grantee.
*Lechner v. Halling,* 35 Wash.2d 903, 912, 216 P.2d 179 (1950):

Marc J. Sonnenfeld, Jami Wintz McKeon, Philadelphia, Pa., for debtors.

Nathan B. Feinstein, Lawrence G. McMichael, Philadelphia, Pa., for Secured Noteholders.

Howard Glassman, Leon Forman, Philadelphia, Pa., for Programmers.

Susan L. Thorner, Hughes, Hubbard & Reed, New York City, Doron A. Henkin, Philadelphia, Pa., for Viacom.

Mary Walrath, Philadelphia, Pa., for Creditors' Committee.

DAVID A. SCHOLL, Bankruptcy Judge.

In many ways, the various aspects of the Motion before us which are addressed in this Opinion—an effort by the suppliers of programming to the Debtor television stations (hereinafter referred to as "the Programmers") to compel the Debtor stations to immediately resume full payment of their obligations under license contracts with the Programmers—are among the most fascinating of those raised in the several Motions before us in instant five (5) jointly administered bankruptcy cases. The Programmers base their Motions primarily upon 11 U.S.C. § 503(b)(1)(A), which allows administrative expenses for "the actual, necessary costs and expenses of preserving the [Debtors'] estate," and which they contend entitles them to not only assert such claims for the full amount of their contracts, but also to receive immediate current full payments on the contracts underlying such claims. Alternatively, they rely upon 11 U.S.C. § 363(e), which they contend establishes their right to payment of the full amount on their contracts in order to assure "adequate protection" to their interests.

We are constrained to deny *in toto* those aspects of the Programmers' Motion which seek a declaration of their rights to such immediate payment on either of the alternative theories set forth above. We do not believe that § 503(b)(1)(A) supports an administrative claim for amounts due under the contracts for any programming except for the programming that was actually used by the Debtor stations. Further, we do not believe that § 503(b)(1)(A) contains

any requirement that administrative claims be paid prior to the effective date of the Plan, and we would certainly be unwilling to impose such a requirement as to claims for unused licensing rights arising from executory contracts, such as are in issue here, which have not yet been accepted by the Debtors. We also fail to see anything in § 363(e) which requires that immediate payments can be successfully demanded in order to "adequately protect" the Programmers' unsecured executory-contract claims against the Debtors.

There is another aspect of the Programmers' Motion which, although left in abeyance, we address here because we believe that to do so will advance the administration of this case along the relatively fast track that we have established in our prior Opinions. We have set the date by which the Debtors must determine whether to accept or reject their executory contracts with the Programmers under 11 U.S.C. § 365(d)(2) at May 15, 1987.

In our first of the three (3) previous Opinions which we have produced on various Motions before us in these cases, we set forth the history of all of the significant Motions which were presented to us over the first four (4) months of administration of them.[1] Presently before us is a Motion of certain of the Programmers styled as a Motion to Compel Assumption or Rejection of Exclusive Licensing Agreements; to Compel Debtors to Make Administrative Payments; [and] for Adequate Protection and Relief from the Automatic Stay. This Motion was originally filed by MCA Television, Ltd., Lorimar Telepictures Distribution, Inc., Paramount Pictures Corporation, Embassy Communications, and Republic Pictures Corporation on January 16, 1987. On January 20, 1987, several other Pro-grammers, CPA Holdings, Inc., MGM/UA Communications Co., Twentieth Century Fox Film Corporation, and MPC Producers, Inc., joined in this Motion; and, on February 6, 1987, Buena Vista Television, Inc. joined the Motion as well.

The Debtors and the two (2) other groups of creditors involved in this case, the Secured Noteholders[2] and a group of unsecured creditors of the Debtors who are not Programmers (hereinafter referred to as "the Trade Creditors"), filed Answers opposing the Programmers' Motion on, respectively, January 30, 1987 (Debtors and Secured Noteholders), and January 23, 1987 (Trade Creditors).

We conducted a hearing on this Motion in one full day of trial on February 9, 1987. At the outset of the trial, the Programmers and the Debtors offered to us a Stipulation dated February 8, 1987, This Stipulation, and the subsequent trial, adduced the the following significant facts of record:

1. The Debtors' position was that they were required to pay for only so much programming as they were actually playing, as opposed to the entire amount of programming concerning which the Debtor stations had licensing contracts. In the course of the testimony, it was established that the Debtor stations were actually paying the amounts which they contended were due on a monthly basis, and were in fact paying the licensing fees for the entire packages of programming from which they had played any single constituent program during the month.

2. The Debtors, for purposes of determination of this Motion, were willing to accept as substantially correct the amounts for billing and payments set forth by the Programmers' employees in various Decla-

---

1. The initial Opinion addressed (1) Consolidated Motions by the Debtors, for permission to use cash collateral, per 11 U.S.C. § 363(c)(2); and by the allegedly secured investors in the Debtor stations (referred to hereinafter as "the Secured Noteholders") to obtain relief from the automatic stay, per 11 U.S.C. § 362(d). We granted the Debtors' Motion and denied that of the Secured Noteholders in our First Opinion of March 2, 1987; (2) An application by the Debtors to approve a Settlement Agreement with a major Programmer not joining in the instant Motion,

Viacom International, Inc., which we granted in our Second Opinion of March 2, 1987; (3) Motions by competing Creditors' Committees as to what creditors should make up the Official Unsecured Creditors' Committee and which firm should be appointed as counsel, which we addressed in an Opinion of March 24, 1987.

2. See page 894, note 1 *supra* for a further identification of these parties.

rations attached to the Motion and the joinder thereto, subject to subsequent adjustments. Thus, the parties made clear that they wished the Court to ascertain their respective rights generally, rather than deal with the specifics of the Debtors' liabilities under particular contracts.

3. The parties, in the same vein, stipulated that the total amounts claimed by all of the Programmers over the life of the licensing agreements were approximately $191 million, and the monthly payments due during 1987 were approximately $4 million per month.

4. The parties further agreed that that aspect of the Programmers' Motion seeking an Order that the Debtors assume or reject the executory licensing contracts within a specified time, per 11 U.S.C. § 365(d)(2), could be "deferred for a reasonable period of time" to enable the Debtors to make these determinations. At the outset of the hearing, the Programmers also delegated the 11 U.S.C. § 362(d) aspect of their Motion to "tagalong" status by indicating that such relief was requested "only to kick in and be triggered" in the event that the Debtors failed to comply with the payment requirements set forth by this Court in response to the Programmers' Motion.

The Programmers devoted most of the hearing to attempting to develop their theory that the "exclusivity" aspect of their contracts, i.e., provisions which restricted them from licensing the same program packages to any other stations within a 35–mile radius of the Debtor stations, justified an imposition of all of the licensing charges upon the Debtors per §§ 503(b)(1)(A) and 363(e), not merely the charges for programming actually played. The Debtors, meanwhile, sought to establish that paying all of the costs would be so excessive as to doom their reorganization efforts and contended that they received no benefit from the programming not played.

At the end of the hearing, on February 10, 1987, we entered an Order making it clear that the automatic stay remained in place pending our disposition;[3] that the Programmers could file a supplement to their Motion on or before February 23, 1987; and that any other parties could file further Briefs in response (the Debtors and the Secured Noteholders had already filed opposing Briefs) on or before March 2, 1987. At the request of the Programmers, the briefing deadlines were set back a week as part of an Order of February 13, 1987.

It would be an understatement to observe that this Motion has been fully briefed. By March 11, 1987, we had received an opening Brief and a Reply to the initial opposing Briefs of the Debtors and the Secured Noteholders from the Programmers; initial and Reply Briefs from the Debtors and the Secured Noteholders; and another Brief opposing the Motion from the Trade Creditors. All of these Briefs were very well done, and we needed to add very little independent research of our own to come to our conclusions. Because few factual findings are relevant to our decision, we are exercising our prerogative to prepare this Opinion in narrative form, as opposed to presenting it in the less readable form of setting forth separate Findings of Fact, Conclusions of Law, and a Discussion, which we indicated, in *In re Campfire Shop, Inc., Barone v. Strouse, Greenberg Mortgage Co.*, 71 B.R. 521, 524–25 (Bankr.E.D.Pa., 1987), is permissible in deciding motions, per Bankruptcy Rules 9014 and 7052 and Federal Rule of Civil Procedure 52(a).

The primary arguments of the Programmers are based upon § 503(b)(1)(A), which provides as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

---

3. This aspect of the Order was intended to avoid any possible contention that the automatic stay would terminate by effect of § 362(e). *But see In re Clark,* 69 B.R. 885, 891–892 (Bankr.E.D., 1987) (30–day period of § 362(e) begins to run only after Debtor is accorded notice and an opportunity for a hearing).

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; ...

In order to succeed in those aspects of the Motion which they are pressing at this juncture on the basis of this Code section, the Programmers must convince us that the Code supports both of the following conclusions: (1) The entire amounts due under the licensing contracts are "actual, necessary costs and expenses of preserving" the Debtors' estates, i.e., they are administrative expenses; and (2) We should direct that those particular administrative expenses be paid immediately.

Ultimately, the Programmers convince us of neither. Even if we found that the entire amounts due under the licensing contracts were administrative expenses, a conclusion which we reject, we fail to see what authority exists for compelling the Debtors to make these payments immediately.

■ Initially, we address the issue of whether the entire amounts due under the license contracts, as opposed to the amounts due for programming actually used, can be deemed to be administrative expenses. As Collier states in a section relating to the assertion of administrative claims by a landlord of realty against a debtor-tenant, "[t]wo lines of cases have developed with respect to the issue of the extent to which the trustee actually uses and occupies the premises" in ascertaining what claims of a landlord are entitled to be classified as administrative expenses. 3 COLLIER ON BANKRUPTCY, ¶ 503.-04[1][a][ii], at 503–24 n. 14 (15th ed. 1986). The first line holds that "rent claims ... are based on the reasonable rental value of the property without regard to the space actually used by the debtor." *Id.* The second line "holds that reasonable rental value is based on the portion of the leased premises actually used and occupied." *Id.*

The Programmers' Motion seek to convince us to adhere to the first line of cases set forth above, represented most notably by the case of *In re Fred Sanders Co.*, 22 B.R. 902 (Bankr.E.D.Mich.1982). This line

of cases draws its ultimate support from a pre-Bankruptcy Act Supreme Court decision, *Kneeland v. American Loan & Trust Co.*, 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379 (1890), wherein the Court held that, where a railroad receiver had taken possession of certain rolling stock during the course of his receivership, he should be liable for the rent for *all* of the stock, even if he did not use it all. Although we are not prepared to say that *Fred Sanders* represents either the majority or the minority view, there is no question that several courts have expressly followed it. *See, e.g., Mohawk Industries, Inc. v. Related Industries, Inc.*, 64 B.R. 667, 669 (D.Mass.1986); *In re Longua*, 58 B.R. 503, 504 (Bankr.W.D.Wis. 1986); *In re Energy Resources, Ltd.*, 47 B.R. 337, 338 (Bankr.D.Mass.1985); *In re Tucci*, 47 B.R. 328, 333 (Bankr.E.D.Va. 1985); and *In re International Storage Corp.*, 41 B.R. 808, 809 (Bankr.E.D.Wis. 1984).

On the other hand, many courts have expressly refused to follow the *Fred Sanders* decision. The most vociferous dissent is contained in the district court decision in *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. 606, 610–13 (N.D.Ga.1985), which holds, in overriding none other than former Judge William L. Norton, Jr., Author and Editor-in-Chief of a respected Bankruptcy law commentary, that "the *Sanders* Rule is contrary to the relevant statutory description of administrative expenses," which emphasizes that such expenses are only allowable for costs which are "actual" and "necessary" to the estate. These outspoken sentiments of *Broadcast Corp.* were summarily but clearly affirmed by the Eleventh Circuit Court of Appeals *sub nom. In re Subscription Television of Greater Atlanta*, 789 F.2d 1530 (11th Cir.1986). Other decisions have as well expressly declined to follow *Fred Sanders. See, e.g., In re N-Ren Corp.*, 68 B.R. 404, 406–07 (Bankr.S.D. Ohio 1986); and *In re Intran Corp.*, 62 B.R. 435, 436–37 (Bankr.D.Minn.1986).

This second line of cases, like the first line, also draws upon a Supreme Court authority, the decision in *Philadelphia Co. v. Dipple*, 312 U.S. 168, 174, 61 S.Ct. 538,

541, 85 L.Ed. 651 (1941), wherein the Court held that, during the period in which the trustee was in the process of deciding whether to accept or reject a lease contract, the trustee was liable to pay only "the amount due for use and occupation." Similar reasoning is expressed earlier by the same Court of Appeals that decided *Broadcast Corp.* in *In re Airlift International, Inc.*, 761 F.2d 1503, 1508 (11th Cir.1985), and by the Ninth Circuit Court of Appeals in *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1354 (9th Cir.1983). Numerous lower courts have likewise reached a result contrary to *Fred Sanders. See, e.g., Dallas-Ft. Worth Regional Airport Bd. v. Braniff Airways, Inc.*, 26 B.R. 628, 631 (N.D.Tex.1982); *In re Dixie Fuels*, 52 B.R. 26, 27 (Bankr.N.D.Ala.1985); *In re Destron, Inc.*, 40 B.R. 927, 928 (Bankr.N.D.Ill. 1984); *In re Adwar Video Corp.*, 38 B.R. 628, 629 (Bankr.S.D.N.Y.1984); *In re Rhymes, Inc.*, 14 B.R. 807, 808 (Bankr.D. Conn.1981); and *In re Standard Furniture, Inc.*, 3 B.R. 527, 530 (Bankr.S.D.Cal. 1980).

There are several decisions of this Court which address the issue of allowable administrative expenses arising from executory contracts, including three (3) decisions of former Chief Judge Emil F. Goldhaber, *In re William H. Herr, Inc.*, 61 B.R. 252 (Bankr.E.D.Pa.1986); *In re C & L Country Market of New Market, Inc.*, 52 B.R. 61 (Bankr.E.D.Pa.1985); and *In re Ram Mfg. Co.*, 38 B.R. 252 (Bankr.E.D.Pa.1984); one by present Chief Judge Thomas M. Twardowski, *In re Fabian*, 46 B.R. 139 (Bankr. E.D.Pa.1985); and one by our predecessor, Judge William A. King, Jr., *In re Gourmet Gallery, Inc.*, 27 B.R. 912 (Bankr.E.D.Pa. 1983). None expressly embrace or reject *Fred Sanders.* However, the fact that Judge Goldhaber refuses to grant an administrative claim for the entire rent due in *C & L* and *Ram* is suggestive of a rejection of the reasoning of *Fred Sanders;* also suggestion of this tendency is the observation that Judge King, in *Gourmet Gallery,* expressly cites to *Dipple* and not *Kneeland.*

■ We are unable to follow the holding of *Fred Sanders* for several reasons. We agree with the *Broadcast Corp.* court that the focus of the express language of § 503(b)(1)(A) is upon the *necessity* of the expenses to *preservation* of the debtor's estate, not upon the fact that the party dealing with the debtor may have a valid contention that the debtor unfairly breached a contractual duty to the lessee.

■ We believe there is a basic policy reason why the reasoning of *Fred Sanders* is unacceptable. We do not consider it to have been the intent of Congress, in enacting § 503(b)(1)(A), to saddle debtors with special post-petition obligations lightly or give preferential treatment to certain select creditors by creating a broad category of administrative expenses. Hence, we would read § 503(b)(1)(A) narrowly, and so reading it cannot conclude that costs for unused property is *necessary* to preservation of a debtor's estate. As we pointed out in *In re Jennings,* 67 B.R. 106 (Bankr.E.D.Pa.1986), and amplified in our previous decision in this case relative to Creditors' Committees, *In re Grant Broadcasting of Philadelphia, Inc.* (Third Opinion), 71 B.R. 655, 661 (Bankr.E.D.Pa., 1987), keeping administrative costs to a minimum preserves the debtor's necessarily scarce resources and thus encourages rehabilitation.

We fully understand the public policy of classification of certain financial commitments from creditors to a debtor as administrative expenses. Generally, this policy is to encourage creditors to supply necessary resources to debtors post-petition. However, we believe that the furtherance of this policy is diminished where, as here, the creditor is asserting that its administrative claims arise as a result of pre-petition executory contracts which commit creditors to supply resources, as opposed to contracts which are formulated post-petition. Therefore, we have a conceptual difficulty in readily extending the classification of administrative expenses to the Programmers' claims.

We further note that application of the principle that liberal allowance of administrative expenses will exhaust the debtor's scarce resource is particularly appropriate to apply to the instant factual setting. The Debtor stations are having difficult cash flow problems even under their present payment patterns, which resulted, in December, 1986, of payments of only approximately $1.3 million for programming, as opposed to the $4.3 million which the Debtors would be obliged to pay if the Programmers succeeded in this Motion. The Debtors' Director of Finance, Richard Leberman, testified that, assuming that this Court approved the then-proposed Settlement Agreement which the Debtors made with Viacom International, Inc., which came to pass, the Debtors could realistically afford to pay no more than about $2 million monthly for programming. Obviously, an obligation to pay in excess of $4 million monthly would severely hamper and might entirely eliminate any possibility that the Debtors could successfully reorganize.

We must also observe that we are distressed when we consider the impact which our embrace of the Programmers' stance would have upon the operation of § 365(d). The Code provides the debtor with a certain period wherein he can choose which executory contracts he will accept and which he will reject. If the Programmers' position were accepted, we would place the Debtors in the position of being liable for their full contract obligations on executory contracts prior to acceptance or rejection. This would create tremendous pressure upon the Debtors to reject as many contracts as quickly as possible. The Code, at § 365(d)(2), accords the debtor a "breathing space" in the period until the time of confirmation of the Plan to make this choice unless the obligee in the executory contract forces an earlier determination. We believe that the incentive to force a more rapid choice must remain on the obligee.

We cannot accept the Programmers' argument that the exclusivity feature of the licensing contracts is such an overriding factor as to justify an embrace of the reasoning of *Fred Sanders* more quickly in considering such contracts than we should in other contexts. The argument of the Programmers is that the Debtor stations receive certain direct benefits from having a supply of extra programming and from depriving other competitors in their market from use of the programming in issue, and that the Programmers experience a special detriment because they cannot sell the same programming to other competitors in the market.

The fact that the Debtors may unfairly benefit from maintaining a supply of extra programming is a situation which the Programmers could have resolved by pressing the § 365(d)(2) aspect of their Motion instead of the §§ 503(b)(1)(A) and 363(e) aspects. We are, as we indicated, planning to resolve that problem by requiring the Debtor stations to decide whether to assume or reject the licensing contracts by May 15, 1987, a time deadline only about six (6) months after the filings and hence itself rather expedited. Thus, we will not permit the Debtors to unfairly squirrel away programming and deprive the Programmers from marketing programming which is unused by the Debtors elsewhere.

Further, we must observe that the consideration that the possession of programming by the Debtor stations deprives the owner-lessor-Programmers of the opportunity to make use of the programming is far more pertinent in a more common type of executory-contract situation, i.e., where a rental of realty is in issue, than in the instant situation. A debtor's possession of realty necessarily deprives a landlord of its complete use. It is virtually impossible for a landlord to re-rent realty even if the debtor is not using it as long as his potential right to utilize the realty remains viable—and protected by 11 U.S.C. §§ 362(a)(1), (3), (4), and (5) of the Code.

This observation, as well as the respect that our common-law heritage gives to the rights of owners of land, explains, in part, the special treatment which Congress has accorded landlords in amendments to 11 U.S.C. §§ 362(b)(10), 365(d)(3), and 365(d)(4). The 1984 amendments to § 365(d)(3) strengthen the claim of a land-

lord that, in a realty-lease situation, *Fred Sanders* should be followed. We of course have no need to reach that question here. However, we must note that *Fred Sanders* and, as far as we can tell, all of the cases which follow it, are realty-lease situations. There is, therefore, some considerable question as to whether *Fred Sanders* would ever be invoked in a situation involving a non-realty lease. For our purposes, it is merely sufficient to note that the hardship flowing to the Programmers due to the allegedly "unique" exclusivity aspect of the licensing contracts in question does not, to our thinking, equate with the hardship flowing to landlords in the realty-lease situation, which is the only situation to which the *Fred Sanders* approach has been applied. Given our articulated tendency to restrict the scope of administrative claims, we are most unwilling to extend the application of *Fred Sanders* further than it has been to date. We believe that it would be necessary to do so to embrace the position of the Programmers.

Before leaving this topic, we add two comments about the two distinct lines of cases in this area. First, if the issue had to be decided strictly on the basis of whether we must follow *Kneeland* or *Dipple* on the instant facts, the issue does not appear particularly close. The actions of the trustee in *Kneeland* were analogous to those of a debtor who, under the Code, has accepted an executory contract. Had the Debtors here accepted any of the Programmers' executory license contracts, they would clearly be liable to fulfill their entire contractual obligations of those they had accepted. However, in *Dipple*, the trustee's stance was, like that of the Debtors here, situated in the interim period between acceptance and rejection. There, the Court, in a decision rendered long after *Kneeland*, clearly held that the trustee was only liable for what he had actually used.

Secondly, all of the local cases cited at page 897 *supra* involve realty leases except *Ram, supra*, and all of the local decisions indicate no inclination to embrace the *Fred Sanders* result even in the realty-

lease context. We believe that the following sentiments expressed by Judge Goldhaber in *Ram* indicate an approach very similar to our own: "administrative claimants ... should not reap benefits unfairly from a troubled debtor to the detriment of [other] unsecured creditors." 38 B.R. at 254.

In our discussion above, we indicated that the Programmers, by asking us to apply *Fred Sanders* to a non-realty rental situation, were asking us to significantly expand the holding of that case. However, in tying to their argument that the full payments due to them under the licensing contracts are not merely administrative claims, but administrative claims which must be currently paid in full, the Programmers ask us to make an even more significant expansion of the holding of *Fred Sanders*. We must observe that *Fred Sanders*, and *all* of the cases cited which follow it, presented only the question of whether the lessor's claims were administrative, not the further demand that they were administrative claims which must be paid in full during the course of the case rather than at the effective date of the Plan, which we believe that 11 U.S.C. §§ 1129(a)(9), 507(a)(1), and 503(b)(1)(A), when read together, clearly contemplate is the normal time when administrative claims must be paid.

We believe that there is no authority whatsoever for the principle that administrative claims should generally be paid immediately. We do not understand even the Programmers to so maintain. Rather, their argument is based upon statements in a few cases that *certain* administrative claims are so chargeable.

We preface this discussion by incorporation of our previous holding that the concept of administrative claims should be narrowly construed. We again make note of the special plight of landlords, since the only supportive cases in the Programmers' tiny arsenal on this issue involve claims of landlords. *In re Axton*, 641 F.2d 1262 (9th

Cir.1981) (Act case); and *In re Kors, Inc.*, 13 B.R. 683 (Bankr.D.Vt.1981).[4]

On the other hand, numerous courts have rejected pleas of administrative claimants that they be paid currently or immediately. *See, e.g., In re Verco Industries, Inc.*, 20 B.R. 664, 665 (9th Cir.Bankr.App.1982) (court has discretion as to when rent claim can be paid; apparently refusing to apply *Axton's* holding to Code case); *In re Baptist Medical Center of New York, Inc.*, 52 B.R. 417, 419–22 (S.D.N.Y.1985), *aff'd*, 781 F.2d 973 (2d Cir.1986) (Court of Appeals expressly adopts district court Opinion which expressly declines to follow *Axton* in interpreting Code); *In re Budget Uniform Center, Inc.*, 71 B.R. 652, 654 (Bankr. E.D.Pa., 1987) (Chief Judge Twardowski of this Court holds that an administrative claimant "must wait for confirmation of a plan before becoming entitled to payment"); *In re Lumara Foods of America, Inc.*, 50 B.R. 809, 817 (Bankr.D.Minn.1985) (court declines request of state to require current tax payments); *In re Charlie Altman Pontiac-Cadillac-GMC, Inc.*, 23 B.R. 50, 51 (Bankr.N.D.Ala.1982) (claimant of priority claim for uniform rentals denied request for current full payment); and *Standard Furniture, supra*, 3 B.R. at 532–33 (landlord denied immediate rent payment).

■ Given the foregoing authority, it is clear that even parties whose claims have been adjudicated to be administrative claims have rarely, if ever, been accorded a right *to immediate or current payments* solely because of their status as administrative claimants. Certainly here, where we hold that the Programmers administrative claims are restricted to the programming actually used by the Debtors, and the Debtors *are* currently paying for the programming used, we are not inclined to order any further immediate payments from the Debtors, at least on the basis of anything contained in § 503(b)(1)(A).

The Programmers have, however, an alternative basis for their quest for full, current payment on their licensing contracts. This argument is based upon 11 U.S.C. § 363(e), which provides as follows:

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

At the outset, we note the different considerations involved in interpretation of § 363(e) as opposed to § 503(b)(1)(A). Where § 503(b)(1)(A) focuses on the needs of the debtor, § 363(e) focuses upon the protection of the interests of the creditor. Hence, our conclusion that § 503(b)(1)(A) is of no help to the Programmers is not decisive of the issue of the Programmers' potential rights under § 363(e).

The Programmers are, however, forced to confront at the outset a two-pronged attack on the issue of whether § 363(e) applies at all, based upon contentions that (1) § 363(e) applies to only secured creditors; and (2) § 365 contains the exclusive remedies for obligees under executory contracts.

The principal authority presenting these contentions is *In re Sweetwater*, 40 B.R. 733 (Bankr.D.Utah 1984). In that case, the court engages in a lengthy analysis of legislative history and concludes that Congress only meant to extend the concept of adequate protection to the interests of secured creditors. The reasoning of *Sweetwater* was apparently anticipated by Judge King of this Court in *In re Dunkle Associ-*

---

**4.** The only other cases cited by the Programmers do not support their position at all. In *In re Boston & Maine Corp.*, 719 F.2d 493 (1st Cir.1983), the court *upheld* the deferral of payment of the debtor-railroad's city taxes, even though that case had been filed in 1970, and the date of payment was nowhere in sight. We do not intend to let this case linger as that case obviously had. In *In re Dakota Industries, Inc.*, 31 B.R. 23 (Bankr.D.S.D.1983), the court merely observed in dictum that pre-confirmation payments of administrative expenses were a possibility. Finally, the court in *In re Western Farmers Ass'n*, 13 B.R. 132 (Bankr.W.D.Wash.1981), rejected a request that administrative claimants were entitled to interim payments.

*ates, Inc.,* 19 B.R. 481, 485 n. 10 (Bankr.E.D.Pa.1982), and has been expressly followed in this Circuit, *In re Wheeling-Pittsburgh Steel Corp.,* 54 B.R. 385, 390–91 (Bankr.W.D.Pa.1985), and elsewhere. *IFG Leasing Co. v. Christensen Hatch Farms,* 56 B.R. 237, 239 (D.Minn.1985).

However, the reasoning of *Sweetwater* was not applied by Judge King in his later decision in *In re Dabney,* 45 B.R. 312 (Bankr.E.D.Pa.1985), nor by former Chief Judge Goldhaber in his decisions in *In re Castle Tool Speciality Co.,* 22 B.R. 44 (Bankr.E.D.Pa.1982); and *In re A.L.S., Inc.,* 3 B.R. 107 (Bankr.E.D.Pa.1980). In all of these cases, this Court, without discussion of the applicability of the concept of adequate protection to the interests of the landlord-creditors before them, assumed its application in setting forth conditions which the Court held were sufficient to adequately protect landlords. Finally, in *In re Borbridge & DeSantis,* 66 B.R. 998, 1001–02 (Bankr.E.D.Pa.1986), Judge Fox of this Court expressly declined to follow *Sweetwater* in a landlord-tenant context. Other courts, *e.g., In re Braniff Airways, Inc.,* 783 F.2d 1283, 1286 (5th Cir.1986); and *In re Inn at Longshore, Inc.,* 32 B.R. 942 (Bankr.D.Conn.1983); and, on one occasion, we ourselves, in *In re Adams,* 65 B.R. 646, 646–49 (Bankr.E.D.Pa.1986), have implicitly refused to follow *Sweetwater.*

■ Considering the foregoing, we cannot justify a rigorous adherence to the holding of *Sweetwater.* We believe that there is an interplay, rather than a mutual exclusivity, between 11 U.S.C. § 362(d) and 11 U.S.C. § 365(d). If an executory contract is rejected per § 365(a), or by operation of § 365(d)(1), (d)(2), or (d)(4), we believe that § 362(d) is the only avenue which the obligee in an executory contract can travel to obtain the relief from the stay that we believe is necessary to put in motion the state-law remedies which the obligee must invoke to actually exercise his rights against defaulting debtors. Given our holding in *Adams* that the Bankruptcy Code provides no remedy for the obligee, but that he must resort to legal, state-court process for a remedy, we are at a loss to understand what the *Sweetwater* court expects the obligee to do to exercise his own rights to recover his property, even if he is able to prove that the debtor's rights are cut off by the terms of § 365.

We do, however, believe that there is some force to the *Sweetwater* analysis in the context of executory contracts other than those concerning rentals of realty. We note that *Borbridge & DeSantis, Adams, Dabney, Braniff, Longshore, Castle Tool,* and *A.L.S.* all involved real property leases, and *Sweetwater* and *Wheeling-Pittsburgh* did not. We also find the Programmers' invocation of § 363(e) as a source of relief apart from § 362(d) misplaced. Juxtaposed as it is in § 363, with the cash collateral provisions, the Programmers apparently read § 363(e) as creating a separate right to a declaration of certain payments which must be made to constitute adequate protection before the Debtors could be permitted to use the Programmers' product, similar to a declaration that the rights of secured parties must be adequately protected before a debtor is permitted to use cash collateral, per § 363(c)(2). However, we believe that, to the extent that § 363(e) applies at all to unsecured creditors, it is to reinforce the notion of what might constitute lack of adequate protection, per § 362(d)(1), such as would permit the obligee of an executory contract to obtain relief from the automatic stay.

■ Thus, we believe that § 363(e) cannot be utilized as a vehicle to obtain a declaration of what constitutes adequate protection of their interests in the sense which the Programmers seek to invoke it. We believe that the Programmers' remedy, if they contend that they are not adequately protected, is to assert that they are entitled to relief under § 362(d), and for the Court to determine, in that context, whether their interests are adequately protected. If they succeed in such a § 362(d) motion, then they may invoke extra-bankruptcy remedies to protect their rights. They may, of course, also invoke § 365(d)(2) to compel the Debtors to accept or reject any particular licensing contracts within a specified time-frame.

■ We are in a position to cut short this process here. We believe that the Debtors' voluntarily remittance of payments for whatever programming they use does constitute adequate protection to the Programmers' rights. Whether performance of anything less could constitute adequate protection is not before us. If and only if the Debtors do not maintain their present and intended further payment performance would we consider granting relief on the § 362(d) aspect of the Programmers' motion. Otherwise, an attempt to obtain such relief on this record must be, in our view, destined to defeat, and we can hence dispose of it here.

■ We further believe that, barring any sort of success by the appellants in appeals from our decision approving the Debtors' settlement with a major Programmer, Viacom International, Inc., *see In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 390 (Bankr.E.D.Pa., Opinion and Order filed March 2, 1987, and Feb. 26, 1987, respectively), the Debtors should be in a position to shortly decide which programming contracts they will accept and which they will reject. In order to protect the rights of the Programmers and in order to comply with our directive that the Debtors must prepare and file a proposed plan on or before June 26, 1987, we are establishing May 15, 1987, as the date by which the Debtors must assume or reject all of the programming contracts with the entities which have joined in this Motion. We believe that we can enter such an order even if the parties do not specifically request us to do so, as a means of resolving a 362(d) Motion. *See Borbridge & DeSantis,* 66 B.R. at 1001; *In re Vermont Real Estate Trust,* 25 B.R. 809, 813 (Bankr.D.Vt.1982); and *In re Horn & Hardart Baking Co.,* 19 B.R. 597, 598 (Bankr.E.D.Pa.1982) (per KING, J.). We find this date to constitute a requisite balance, considering the pertinent elements: " 'the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, and the safeguards afforded these litigants.' " *In re Lionel Corp.,* 23 B.R. 224, 225 (Bankr.S. D.N.Y.1982) (quoting *In re Midtown Skat-*

*ing Corp.,* 3 B.R. 194, 198 (Bankr.S.D.N.Y. 1980)). *See also, e.g., In re Flying W Airways, Inc.,* 328 F.Supp. 1256, 1257 (E.D. Pa.1971); *In re Giant Markets, Inc.,* 28 B.R. 335, 335 (Bankr.M.D.Pa.1983); and *Horn & Hardart Baking Co., supra.* We also believe that this will give us at least some time to resolve any disputes which arise in the assumption and rejection process prior to the date when the Debtors' proposed Plan must be filed.

An Order consistent with the within Opinion shall be entered.

## ORDER

AND NOW, this 30th day of March, 1987, upon consideration of the Motion of MCA Television, Ltd., Lorimar Telepictures Corporation, Embassy Communications, Republic Television, Paramount Television Domestic Distribution, Inc., CPA Holdings Inc., MGM/UA Communications Co., Twentieth Century Fox Film Corp., MPC Producers, Inc., and Buena Vista Television, Inc., (hereinafter referred to as "the Movants") to Compel Assumption or Rejection of Exclusive Licensing Agreements; to Compel Debtors to Make Administrative Payments; [and] for Adequate Protection and For Relief From the Automatic Stay (hereinafter referred to as "the Motion"), and after hearing of February 9, 1987, and extensive briefing on same, it is hereby ORDERED AND DECREED that the Motion is GRANTED in part and DENIED in part, as follows:

1. The Movants' request to have this Court direct the Debtors to make payments under the parties' licensing agreements other than for programming actually used by the Debtors, pursuant to 11 U.S.C. §§ 503(b)(1)(A) or 363(e), is DENIED.

2. The Debtors are directed to determine whether to assume or reject the licensing agreements of any of the Movants, pursuant to 11 U.S.C. § 365(d)(2), on or before May 15, 1987.