**In re NATIONAL LIQUIDATORS, INC., Debtor.**

**No. C–2–94–1066.**
**Bankruptcy No. 93–56266.**

United States District Court,
S.D. Ohio,
Eastern Division.

April 18, 1995.

Myron S. Terlecky, Columbus, OH, for National Liquidators, Inc.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the bankruptcy court's denial of Squire, Sanders, & Dempsey's application for attorneys' fees. The bankruptcy court denied the application because it found that Squire, Sanders, & Dempsey had represented an interest adverse to the Committee of Unsecured Creditors and had failed to timely disclose its representation of a creditor. For the reasons that follow, the Court **REVERSES IN PART, AFFIRMS IN PART,** and **REMANDS** for further proceedings.

**1.** All citations to the "Records on Appeal" are indicated in this OPINION and ORDER through the abbreviation "R." with the accompanying record number or letter.

## I.

In October 1993, Vance Wolfe, principal and founder of National Liquidators, Incorporated ("National Liquidators"), disappeared leaving debts owed to hundreds of creditors. (R. 6 at 46.)[1] Mr. Wolfe had raided the corporate coffers for personal use, turned investor accounts into a classic "Ponzi Scheme," and bankrupted National Liquidators. (R. 6 at 29–44.)

As a result of Mr. Wolfe's actions, on October 13, 1993 three investors filed a petition pursuant to 11 U.S.C. § 303 for involuntary reorganization of National Liquidators. (R.D.) The Securities and Exchange Commission ("SEC") followed suit by filing a separate civil suit ("SEC action") against Mr. Wolfe and National Liquidators alleging securities law violations and seeking injunctive relief. *SEC v. Wolfe,* C2–93–1014.

On November 8, 1993, the Committee of Unsecured Creditors ("the Committee") elected Mr. Lucas, a creditor of National Liquidators, as co-chairman of the Committee and decided to retain Squire, Sanders, & Dempsey ("SS & D") as legal counsel in the bankruptcy proceeding. (R. 45 at 3; 47 at 2.) On November 9, the Committee filed an application with the bankruptcy court, signed by Mr. Lucas, seeking appointment of SS & D as counsel for the Committee. (R. 2.) The bankruptcy court granted the application and appointed SS & D on November 30, 1993. (R. 5.)

Less than five months later, the business of National Liquidators had deteriorated to such an extent that reorganization as a going concern was no longer feasible. (R. 29; 45 at 3; 46 at 29–30.) As a result, on March 18, 1994, the United States Trustee agreed to appoint a Chapter 11 trustee to proceed with the liquidation of National Liquidators. (R. 35; 36.)[2] Because of the agreed appointment of a Chapter 11 trustee, SS & D con-

**2.** One of the Chapter 11 Trustee's principle duties was to aid in the prosecution of recovery actions. At the time of the hearing before this Court in February 1995, however, no recovery actions had been brought against any person.

cluded its active representation of the Committee. (R. 46 at 30, 36, 44–55, 52–53.)

On May 6, 1994, SS & D filed its application for fees and expenses. (R. 39.) In that application, SS & D disclosed to the bankruptcy court, for the first time, that it had represented Mr. Lucas in the SEC action. (*Id.*) As it turns out, on October 27, 1993, Mr. Lucas had scheduled a meeting with the SEC to give testimony regarding his knowledge of and connection with National Liquidators. Prior to attending that meeting, Mr. Lucas retained SS & D attorney Phillip Lehmkuhl to discuss the upcoming meeting. (R. 45 at 3 ¶ 5; 46 at 27.) Mr. Lehmkuhl accompanied Mr. Lucas to the meeting and informed the SEC that Mr. Lucas's testimony would have to be postponed because of the retention of counsel just a few hours earlier. (*Id.*)

SS & D formally recognized this attorney-client relationship on November 5, 1993 when William Todd, an attorney for SS & D, "opened the file" for Mr. Lucas. (R. 47 at 2.) That representation continued until early March of 1994, (R. 43 at Ex. A; 43 at Exs. B, C.), and in the interim, Mr. Lucas informed the SEC that, if called to testify in the SEC action, he would invoke the Fifth Amendment privilege. (R. 43 at Exs. B, C.)

The Chapter 11 Trustee believed SS & D had untimely disclosed the representation of Mr. Lucas and that such representation created an interest disqualifying SS & D from representing the Committee. As a result, the Chapter 11 Trustee objected to the fee application. (R. 43 at 2–9.)

After a hearing on the application, the bankruptcy court concluded that SS & D had "failed to provide adequate disclosure and represented an adverse interest." (R. 49 at 19.) Based on that finding, the bankruptcy court denied the fee application *in toto* and ruled that it would award fees to the Chapter 11 Trustee. (*Id.* at 19–21.)

## II.

■ This Court's review of the bankruptcy court's retention and compensation orders is limited to abuse of discretion. *In re Federated Dept. Stores, Inc.,* 44 F.3d 1310,

1315 (6th Cir.1995). The Court follows the bankruptcy court's findings of fact unless clearly erroneous, but when reviewing for abuse of discretion on questions of law, the Court exercises plenary review using a *de novo* standard. *Id.*

## III.

■ To ensure protection for unsecured creditors in Chapter 11 reorganization proceedings, the United States Trustee normally will appoint a committee of creditors holding unsecured claims against the debtor. 11 U.S.C § 1102(a)(1). The committee is intended to be a partisan representative of the different interests and concerns of the creditors. *In re Daig Corp.,* 17 B.R. 41, 43 (Bankr.D.Minn.1981). The committee's primary function is to advise the creditors of their rights and proper course of conduct in the bankruptcy proceedings. *In re Subpoenas Duces Tecum,* 978 F.2d 1159, 1161 (9th Cir.1992). Ordinarily, it consists of those persons who hold the seven largest unsecured claims against the debtor. 11 U.S.C. § 1102(b)(1).

The Bankruptcy Code grants committees the power to employ professionals. 11 U.S.C. § 1103(a). Prior to 1984, however, it barred legal counsel for a creditor's committee from representing any other entity in connection with the case. *In re Combustion Equip. Assoc.,* 8 B.R. 566, 567–68 (Bankr. S.D.N.Y.1981). Consequently, where attorneys accepted invitations to represent a creditor's committee, those attorneys were required to cease all representation of their original creditor-clients. *In re Whitman,* 101 B.R. 37, 38 (Bankr.N.D.Ind.1989). Many attorneys were unwilling make that sacrifice, so often times the prohibition frustrated both the goal of ensuring competent representation for committees and the committee's right to choose counsel of its choice. *Id.*

■ Congress liberalized the restrictions on dual representation by amending 11 U.S.C. § 1103(b) in 1984. The amended provision now states, in part:

An attorney ... employed to represent a committee ... may not, while employed by such committee, represent any other entity having an adverse interest in connection

with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

*Id.* The provision is intended to prevent attorney conflicts of interest. *In re Rusty Jones, Inc.,* 107 B.R. 161, 163 (Bankr.N.D.Ill. 1989); *In re Oliver's Stores, Inc.,* 79 B.R. 588, 594 (Bankr.D.N.J.1987). Thus, it prohibits concurrent representation if such representation would interfere with counsel's vigorous advocacy for either client, jeopardize counsel's undivided loyalty to either client, or endanger the confidences and secrets of either client. *In re Oliver's Stores, Inc.,* 79 B.R. at 593–94; *see, e.g.,* Title 19 Ohio Rev.Code Ann. Cannons 4, 5 (Anderson 1994). It also prohibits dual representation where there exists even the appearance of impropriety. *In re Oliver's Stores,* 79 B.R. at 594; *see, e.g.,* Title 19 Ohio Rev.Code Ann. Cannon 9 (Anderson 1994). Therefore, the amendment did not alter the prohibition of counsel representing an individual creditor and a creditor's committee if the individual creditor hired counsel to litigate issues potentially adverse to the other committee members. *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 655 (Bankr. E.D.Pa.1987).

The Bankruptcy Code does not define to "hold an adverse interest." Courts have defined it to mean: "to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant." *See, e.g., TWI Int'l v. Vanguard Oil & Serv. Co.,* 162 B.R. 672, 675 (S.D.N.Y.1994).

■ Committees, with the aid of their attorneys and the independent examiners, investigate the legitimacy of creditors' claims. They also investigate for the existence of any recovery actions that the estate should pursue against creditors. Therefore, an inherent tension exists between the committee and its members and constituents. This inherent tension was well recognized prior to the 1984 amendments to section 1103(b). *See, e.g., In re Proof of the Pudding, Inc.,* 3 B.R. 645, 647 (Bankr.S.D.N.Y.1980).

■ By eliminating the per se bar to dual representation in 1984, Congress implicitly determined that the inherent tension between a committee and one of its creditors, standing alone, was immaterial and any conflict too theoretical to warrant being classified as an adverse interest. That is, merely the remote potential for dispute, strife, discord, or difference between a committee and one of its creditors does not give rise to any conflict of interest or appearance of impropriety that would bar an attorney from representing both parties.

■ It simply exceeds rational bounds to rule that an adverse interest exists merely because a committee member's or a creditor's transactions with the debtor will be investigated, or because a remote, speculative, hypothetical possibility exists that, in the future, the estate or the Committee may dispute the creditor's claim or bring a cause of action against the creditor. *See In re Poage,* 92 B.R. 659, 666 (Bankr.N.D.Tex. 1988); *In re Peck,* 112 B.R. 485, 492 (Bankr. D.Conn.1990). If the Court were to adopt this definition, then qualified attorneys would be barred from representing any creditor and his committee unless the committee were a special committee divested both of any power or duty to investigate the transactions of its constituents and of any responsibility to advise the Committee on the legitimacy of creditors' dealings with the Debtor and the Committee.

Such a broad definition would create an injustice in cases, such as this one, where courts are called on to evaluate concurrent representation after completion of such representation. In such cases, attorneys would be punished simply because the committee routinely investigated the creditor's transactions or because, at the beginning of the representation, it was hypothetically possible that the estate possessed a cause of action against the creditor or could dispute the creditor's claim.

■ Therefore, the Court believes that section 1103(b)'s bar to attorney representation includes a requirement that there exist some allegation or evidence suggesting the likelihood of some actual dispute, strife,

discord, or difference between the committee and its constituent or member. The Court is not establishing a high threshold. For example, should any evidence suggest the existence of possible challenges to a creditor's claim, the existence of a possible recovery action against the creditor, or the existence of any possible dispute between a committee and one of its constituents or members, then a disqualifying adverse interest exists under the Bankruptcy Code. Undoubtedly, actual disputes or actual allegations of the need for a recovery action engender adverse interests. *See, e.g., Badami v. K.E. Joy,* 175 B.R. 303 (Bankr.D.Neb.1994). Speculation and hypothesizing, however, will not carry the day.

## IV.

The record fails to suggest even the remotest possibility of the existence of any actual dispute, strife, discord, or difference between Mr. Lucas and the Committee. There exists no reason to believe that SS & D had a meaningful incentive to act contrary to the Committee's interest. Furthermore, the facts fail to give rise to the appearance of impropriety.

### A.

#### 1.

█ In finding that Mr. Lucas represented an adverse interest, the bankruptcy court stated:

> First, Mr. Lucas was a close personal acquaintance of Mr. Wolfe, was one of the initial investors, served as a group leader, and his wife served as an employee for the Debtor.

(R. 49 at 17.) The bankruptcy court erred in ruling that those facts demonstrate that Mr. Lucas held an interest adverse to the Committee.

The bankruptcy court cites no authority for the proposition, and this Court renounces the proposition, that a lawyer should not represent one client because that client is a personal friend with an adversary of another of the lawyer's clients. No evidence suggests that even those closest to this case during the period of the dual representation, i.e., Mr. Lucas's fellow creditors and the United States Trustee, were concerned about the friendship.

National Liquidators employed Mrs. Lucas, and Mr. Lucas was a group leader of investors and an initial investor in National Liquidators. The evidence, however, fails to indicate that either Lucas was so closely related to the Debtor to be considered an officer or other key decision-making employee. Thus, no evidence indicates that either Lucas was an "insider" for purposes of the Bankruptcy Code. In fact, Mrs. Lucas's position and relationship with National Liquidators was of such insignificance that the independent examiner chose not to include Mrs. Lucas in the group of employees which the examiner interviewed. (*See* R. 6 at 7–8.)

Vance Wolfe acted alone when he defrauded hundreds of creditors, including Mr. Lucas. No evidence establishes that anyone has disputed Mr. Lucas's claims. The evidence simply demonstrates that Mr. Lucas and his fellow creditors endeavored to protect the unsecured creditors' interests by determining whether National Liquidators should remain a going concern. If National Liquidators could remain a going concern, Mr. Lucas and the Committee shared the common goal of forming a reorganization plan that would maximize the chance for repayment to all unsecured creditors.

#### 2.

█ The bankruptcy court's finding of adverse interest was also premised on the following:

> Mr Lucas [was] a potential preference defendant or a potential fraudulent conveyance defendant. The very questions that the SEC intended to ask Mr. Lucas ... should have been foremost on the minds of Committee counsel. One of the key functions of committees is to, '... investigate the acts, conduct, assets, liabilities, and financial condition of the debtor [including possible causes of action against creditors].' ... The Court cannot fathom how SSD could make the requisite inquiries and take action without violating the confidences and privileges associated with representing both of their clients.

(R. 49 at 17–18) (alterations of original material omitted) (citations omitted.)

The record, however, lacks a suggestion that the estate actually possessed or possesses a valid recovery claim against Mr. Lucas. The record is devoid of any evidence that the Independent Examiner, any creditor, the Committee, the Debtor, or even the United States Trustee ever alleged the existence of a possible dispute concerning Mr. Lucas's transactions or dealings with the Committee or the estate. Moreover, the Chapter 11 Trustee has failed: to challenge Mr. Lucas's claims; to allege that the estate is entitled to recovery from Mr. Lucas; and to allege that Mr. Lucas breached any duty owed to the Committee.

No evidence suggests that SS & D failed to properly question Mr. Lucas about his knowledge of and connection with National Liquidators or Mr. Wolfe, and neither the United States Trustee, nor any creditor, nor the Committee, has ever alleged such a failure. In fact, the record establishes the converse. SS & D attorney John Dilenschneider stated: "Mr Lucas told us as much as he could about [the acquisition and disposition of National Liquidators investor funds and] . . . his activities as an independent contractor." (R. 46 at 60.)

**3.**

■ The bankruptcy court asserted the "lack of progress in this case" as evidence of SS & D's adverse interest. (R. 49 at 18.) The bankruptcy court speculated that representation of an "adverse interest" by SS & D was the reason "why there was not more cooperation and progress" with the SEC. (*Id.*) The court explained that it "[could] not help but believe that the administration of this case would have been enhanced" if SS & D had not represented Mr. Lucas. (*Id.* at 19.) The court then found that the dual representation had reduced SS & D's efficacy as counsel to the Committee and "had contributed to the overall suspicion of the financial transactions in this case." (*Id.* at 20.)

The record does not support the bankruptcy court's findings. No party to the bankruptcy proceedings has ever objected to SS & D's actions as they related to the pace of the bankruptcy proceedings. The bankruptcy court raised these points *sua sponte*, without any evidence being submitted by the parties. Furthermore, after it denied the fee application, the bankruptcy court was unsure as to whether it had even considered certain important evidentiary items. As a result, the court below feared that, had it considered those items, it might have altered its decision. (R. 55 at 28.)

The record sharply contradicts any finding that SS & D "reduced its efficacy as counsel to the Committee" or "contributed to the overall suspicion of the financial transactions in this case." The record gives the clear impression that SS & D worked diligently to expedite the reorganization proceedings in the interest of the Committee and capably represented the Committee. Attached to the fee application is a copy of the 24–page itemized billing statement that details the professional services provided to the Committee by SS & D. (R. 39 at Ex. B.) In addition to its day-to-day work on behalf of the Committee, SS & D:

(a) Provided names of additional investors/creditors to the United States Trustee prior to appointment of the Committee and prior even to its own appointment as counsel; (R. 45 at 1.)

(b) Cooperated with the independent examiner in the preparation of his First Interim Report and Second Interim Report and in his general investigation; (R. 11; R. 39.)

(c) Moved for authority to intervene in the SEC action in order to assure that "any funds recovered by the SEC should be disposed of by the Bankruptcy Court" because "[a]ny other disposition . . . would likely jeopardize the feasibility of this Chapter 11 reorganization and substantially harm the interests of creditors of National Liquidators particularly those who were not involved in securities-related matters (i.e., trade creditors)"; (R. 7 at 3; 8; 10; 15; 16; 17; 18; 21; 24.)

(d) Moved to protect information in the Independent Examiner's reports from competitors of National Liquidators

who might have been able to use it to the disadvantage of the Chapter 11 estate; (R. 9; 10; 12; 28.)

(e) Moved for authority to conduct Rule 2004 examinations of Vance Wolfe and other key witnesses; (R. 11; 14.)

(f) Made arrangements (with the Independent Examiner) for a meeting in Chicago with investors located there; (R. 20; 22; 23.) and

(g) Reached agreement and prepared an agreed order for appointment of a Chapter 11 Trustee. (R. 29; 30; 31; 35; 36; R. 37; 38.)

All these activities occurred within the space of barely four months. They are hardly a sign of "reduced efficacy" or "lack of progress"; they fail to suggest an adverse interest between the Committee members and Mr. Lucas; and they fail to suggest that SS & D has breached any ethical obligations owed to its clients.

### 4.

■ The Trustee erroneously implies that a subpoena issued at the outset of the case demonstrates Mr. Lucas's adverse interest. Three creditors initiated this case as an involuntary reorganization proceeding on October 13, 1993. (R.D.) Under 11 U.S.C. § 303(h)(1), they bore the burden of promptly establishing that "the debtor is generally not paying such debtor's debts as such debts become due." The bankruptcy court scheduled a hearing for this purpose on October 19, 1993 pursuant to Rule 1013(a) of the Federal Rules of Bankruptcy Procedure. (R.E.) Although the record on appeal is unclear, it appears that the bankruptcy court issued the subpoena for Mr. Lucas, along with nine other individuals, for the purpose of aiding the bankruptcy court in its required determination of whether or not "the debtor was paying his debts as such debts [came] due." (*See* R. E; J at 3; 46 at 31–32.)

National Liquidators consented to adjudication under Chapter 11 on October 25, 1993. (R. 49 at 2; G.) The conversion to a voluntary proceeding dispensed with the need for the testimony of Mr. Lucas to establish the requirements of section 303(h)(1). In any event, testimony with respect to the status of National Liquidators or Mr. Wolfe's debts would not have been inherently adverse to the interests of the Committee. The record does not indicate that Miguel Lucas refused or would have refused to comply with the subpoena, nor did SS & D ever represent Mr. Lucas with respect to the subpoena.

### 5.

■ Mr. Lucas's stated intention of invoking the Fifth Amendment in the SEC action does not take the possibility of a dispute, strife, discord, or difference, out of the realm of mere conjecture. The Fifth Amendment to the United States Constitution does not always prohibit an adverse inference in civil actions where a person refuses to testify in response to probative evidence offered against him. *Baxter v. Palmigiano*, 425 U.S. 308, 320, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976). However, " '[a] witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing. The [Fifth Amendment] privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances....' " *Lionti v. Lloyd's Ins. Co.*, 709 F.2d 237, 245 (3rd Cir.1983) (Stern, dissenting) (citations omitted). "Once a witness invokes privilege it is nigh to impossible to determine why he has done so.... [Triers of fact] are left with nothing but rank speculation in attempting to draw inferences from such an event." *Id.; see also, Farace v. Independent Fire Ins. Co.*, 699 F.2d 204, 210–211 (5th Cir.1983). Any inference is even more speculative when a person merely states, outside of legal proceedings, that if called to testify he will assert the Fifth Amendment privilege. Because of these ambiguities, an inference should not be drawn from an invocation of the Fifth Amendment privilege, or a stated intention to invoke the Fifth Amendment privilege, unless other independent evidence demonstrates that the inference is reasonable. *See State Farm Life Insurance, Co. v. Gutterman*, 896 F.2d 116, 119, n. 3 (5th Cir. 1990); *National Acceptance Co. v. Bathalter*, 705 F.2d 924 (7th Cir.1983).

In the case *sub judice*, no reasonable adverse inference can be drawn from Mr. Lucas's stated intention to assert the Fifth

Amendment privilege because no independent evidence suggests that Mr. Lucas holds any interest adverse to, or that he ever engaged in any transaction, dealing, or behavior which was adverse to the estate or the Committee. No evidence suggests that Mr. Lucas was the undeserving beneficiary of any estate properties, engaged in any fraud, or asserted a spurious claim, nor does any evidence suggest that Mr. Lucas breached any fiduciary duty owed to the Committee. No evidence suggests that he possesses information that he did not disclose to the Committee. No evidence suggests that Mr. Lucas was anything but candid and forthcoming during the investigation by those involved with the bankruptcy proceedings. (*See,* R. 6 at 7; 46 at 60; 46 at 48.)

**B.**

■ The Court also finds that the concurrent representation did not give rise to the appearance of impropriety. As a result of the implicit Congressional approval of concurrent representation absent an adverse interest, representation, cannot, in and of itself, create an appearance of impropriety. Furthermore, nothing in the record cited to by the bankruptcy court or the Chapter 11 Trustee, creates the appearance of impropriety.

The fact that those closest to the proceedings during the dual representation have never objected to SS & D's representation of either client is quite instructive. The United States Trustee learned of the dual representation two months before the hearing on fees, yet, as of the date of the hearing before this Court, he has never objected to such representation. Neither have the creditors even though their agents on the Committee knew of the representation. (*See,* R. 46 at 45–46.)

The Chapter 11 Trustee is the only party who objects to the representation, and he does so after the representation has been completed, with only a speculative assertion that an actual attorney's conflict of interest could have existed. The Chapter 11 Trustee's after the fact, speculative assertion is insufficient to create the appearance of impropriety. Neither a reasonable member of the bar nor members of the lay community would believe the dual representation to have been improper.

**V.**

**A.**

The bankruptcy court also denied the fee application *in toto* because the court concluded that SS & D's disclosure "was abysmal in terms of its initial lack of information and in terms of counsel's failure to supplement the record at the earliest opportunity." (R. 49 at 17.) This Court believes that the disclosure failed to comply with the requirements of the Bankruptcy Rules; however, the bankruptcy court abused its discretion when it denied fees *in toto.*

■ Bankruptcy Rule 2014(a) requires that any application seeking appointment of counsel for a creditors committee pursuant to 11 U.S.C. § 1103:

... be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

These disclosure requirements are mandatory. *In re EWC, Inc.,* 138 B.R. 276, 280 (Bankr.W.D.Okla.1992). The duty of professionals is to disclose any and all connections with all creditors. Attorneys cannot pick and choose which connections to disclose, and negligence is no excuse.

■ When an attorney fails to disclose an adverse interest, the Court is required to deny fees *in toto. In re Federated Dept. Stores, Inc.,* 44 F.3d 1310, 1320 (6th Cir. 1995). Even where no adverse interest has been found, some court's find that denial of fees is mandatory where an attorney has failed to meet the disclosure requirements. *In re EWC, Inc.,* 138 B.R. at 280–281.

■ This Court finds, however, that where no adverse interest is discovered, a court, reviewing an application for attorney's fees after representation has been completed, is not required to deny fees *in toto* for an attorney's failure to meet the disclosure re-

quirements. No bankruptcy section speaks directly to circumstances, such as these, where no disqualifying interest exists but an attorney knew of information he was required to disclose but failed to do so. The most analogous section is 11 U.S.C. § 328(a), which provides the Court with discretion to alter conditions of employment, including compensation conditions, "after the conclusion of employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing such terms and conditions." *See In re Begun,* 162 B.R. 168, 178–180 (Bankr.N.D.Ill.1993) In addition, the Court finds that, absent an actual disqualifying interest, justice requires that a court retain discretion whether to deny fees as a sanction for failure to disclose. *See In re Begun,* 162 B.R. at 178–180; *In re Love,* 163 B.R. 164 (Bankr.D.Mont.1993).

**B.**

 It is undisputed that SS & D failed to disclose its connection with Mr. Lucas to the bankruptcy court until May 6, 1994, six months after SS & D began representing Mr. Lucas. The representation of Mr. Lucas concerned matters germane to this bankruptcy action. SS & D, therefore, failed to comply with the disclosure requirements.

 Under the facts of this case, however, the Court finds that the bankruptcy court abused its discretion by denying the application for fees *in toto.* It is undisputed that SS & D performed an abundance of valuable legal services. It is also undisputed that the proposed value of such services was at least $55,000, because no objection to the reasonableness of those fees was lodged in the bankruptcy court.

Because SS & D represented no adverse interest and caused no actual harm to the bankruptcy estate, the $55,000 sanction for failure to timely disclose was inequitable and draconian. Some sanction, however, is appropriate.

Failure to meet the disclosure requirements cannot be tolerated. Inadequate disclosures disable courts from properly determining the propriety of legal employment. This Court will not eviscerate the prophylactic protection against actual conflicts of interest by closing its eyes to violations of the disclosure requirements.

██ The most equitable solution is to deny SS & D only those fees for services performed after the performing person, or the person directing such performance, acquired actual knowledge of the representation of Mr. Lucas.[3] Therefore, remand of this case is appropriate.

██ The Court is unable to determine whether or not the bankruptcy court made any determination as to the reasonableness of SS & D's fee. Thus, unless it already has done so, on remand the bankruptcy court must first determine a reasonable fee for the services performed by SS & D. After the court determines a reasonable fee, the parties shall attempt to negotiate a reasonable sanction. Should the parties fail to come to an agreement on a reasonable sanction, the bankruptcy court shall impose the appropriate sanction for SS & D's failure to timely disclose. Such sanction should be determined by using the equitable solution discussed herein.[4]

**VI.**

Upon consideration and being duly advised, the Court **REVERSES** the bankrupt-

---

**3.** This Court leaves to the parties and the bankruptcy court the duty to determine what services were performed, or directed to be performed, by persons after they actually learned of the dual representation. However, of the eleven members of SS & D who worked with the Committee between November and March 14, 1994, it appears that only Mr. Todd and Mr. Lehmkuhl had actual knowledge of the representation of Mr. Lucas. The other SS & D members appear to have acquired actual knowledge on or after March 15, 1994, a date after which SS & D only completed only a *de minimis* amount of work for the Committee.

**4.** The bankruptcy court also stated that it would award attorney's fees against SS & D at a separate hearing. This decision is not ripe for review as there is nothing on the record demonstrating that the Chapter 11 Trustee has ever filed an application for the assessment of attorney's fees, nor is there any evidence on the record that the court has actually made such an award.

cy court's finding of adverse interest, **AFFIRMS IN PART** and **REVERSES IN PART** the bankruptcy court's findings and rulings on SS & D's failure to meet the statutory requirements for disclosure, and **REMANDS** for further proceedings consistent with this **OPINION** and **ORDER.**[5]

**IT IS SO ORDERED.**

5. In ruling on SS & D's appeal, the Court did not consider the charts used at oral argument. Therefore the "Motion to Strike Charts Used at Oral Argument" is **MOOT.**