**In re W. William ELLSWORTH, III, Debtor.**

**No. 8:02–BK–2785–PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

July 14, 2005.

Alberto F. Gomez, Jr., Morse & Gomez, PA, Tampa, FL, for Debtor.

## ORDER ON DEBTOR'S OBJECTION TO CLAIM NO. 12 OF MERKLE & MAGRI, P.A.

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing on the Objection to Claim No. 12 of Merkle & Magri, P.A. The Objection was filed by the Debtor, W. William Ellsworth, III.

Merkle & Magri, P.A. (the Law Firm) filed Proof of Claim No. 12 in the Debtor's Chapter 11 case in the amount of $42,865.50. The Claim was filed as an unsecured claim, and is based on legal services performed and costs incurred for the prepetition period extending from August of 1998 through December of 2001.

The Debtor objects to the Claim, and asserts that the Law Firm had agreed that "certain deferred fees would only be paid if the Debtor 'prevailed' with respect to certain litigation. The Debtor did not prevail in the litigation, therefore, he disputes that the deferred fees are due and owing." (Doc. 199).

### Background

The Debtor hired the Law Firm in August of 1998. The scope of the engagement was not clearly defined. According to the Debtor, the Law Firm was hired for the purpose of acquiring control of various businesses owned by the Debtor and other members of his family, and to marshal the assets of those businesses. (Transcript, pp. 160–61, 163).

According to Joseph Magri (Magri), a partner with the Law Firm, the scope of the engagement was "amorphous." Magri testified that it "was a scope that would be defined by further events and further dealings. Ultimately we hoped to be able to help them in both understanding and, to the extent necessary, obtaining their rightful share of the family assets. But what

that involved, we didn't know." (Transcript, pp. 84–85).

On August 21, 1998, a "New Case Memo Set" was prepared by the Law Firm. (Law Firm's Exhibit 2). The New Case Memo reflects that the Law Firm's clients were Bill and Kent Ellsworth. The handwritten notation "NCR" also appears on the Memo, and Magri testified that the notation indicated that "no contract was required" for the representation. (Transcript, p. 41).

Under the heading "Fee Arrangements," the New Case Memo reflects that the Law Firm's fee for its services would be charged at the rate of $90 per hour. Also under "Fee Arrangements," a box beside the designation "contingent fee" had been hand-checked, followed by an arrow pointing to the phrase "full rate difference." The phrase "full rate difference" had been inserted by hand, apparently to describe the amount of the "contingent fee."

Finally, the New Case Memo indicated that the Law Firm's statements were to be sent monthly, and that the Law Firm received a retainer in the amount of $4,778.80.

The Law Firm began providing legal services to the Debtor on August 21, 1998, and issued its first monthly statement to Bill and Kent Ellsworth on September 17, 1998. (Law Firm's Exhibit 1). The statement reflects that the Law Firm provided 11.7 hours of services to the Debtor at a rate of $90 per hour, for a total fee of $1,053.00.

Statements were subsequently sent to Bill and Kent Ellsworth in October, November, and December of 1998, and January of 1999. Each of the subsequent statements detailed the services provided, the time expended, and the rate of $90 per hour.

The statement dated February 23, 1999, reflects a current "amount due" of $725.90, after applying the remainder of the retainer held by the Law Firm. For the first time, however, the February statement also includes a separate itemization labeled "Deferred fees due later summary." The "deferred fees" section of the statement lists specific amounts due for each of the prior months from August of 1998 through January of 1999, and reflects a total deferred balance of $15,467.50.

All of the subsequent statements from March of 1999 through November of 1999 include both an amount representing the current charges, billed at the rate of $90 per hour, and also the "deferred fees due later" itemized by month.

The November 1999 statement was the last statement prepared and sent to Bill and Kent Ellsworth on a regular monthly basis. After the November bill, statements were prepared and sent on an irregular basis through January 25, 2002. (Law Firm's Exhibit 1). The January 25, 2002, statement reflects a current balance of $107.50, and "deferred fees due later" in the amount of $42,758.00, for a total of $42,865.50. The sum of $42,865.50 is the amount set forth on the Law Firm's Proof of Claim.

The Debtor filed his petition under chapter 11 of the Bankruptcy Code on February 15, 2002, less than one month after the last statement was mailed.

### Discussion

■ The Debtor and the Law Firm both concede that no written contract evidences their fee agreement in this case. (Transcript, pp. 139, 165). The fee agreement between the parties was an oral agreement.

■ Oral contracts are valid and enforceable under Florida law, and are subject to the same basic contract principles that govern written contracts. *St. Joe Corporation v. McIver*, 875 So.2d 375, 381 (Fla.2004).

According to the oral contract, it appears undisputed that the Debtor and his brother, Kent Ellsworth, agreed to pay $90 per hour on a current basis for the legal services provided by the Law Firm.

Unfortunately, however, the parties disagree on the remainder of the terms included in their oral contract. Their disagreement centers on the nature of the fees claimed by the Law Firm for its standard hourly rates, less the $90 per hour that was billed monthly and paid by the Debtor or his family.

Magri testified that the standard rate charged by Robert Merkle (Merkle), a partner in the Law Firm, was $250 per hour, and the standard rate charged by other members of the firm was $200 per hour, at the time that the agreement was reached. The amount in controversy is the difference between the $90 per hour rate that was billed and paid monthly, and the $200 to $250 per hour standard rate charged by the attorneys in the Law Firm. This difference is the amount that was designated as "deferred fees due later" on the statements sent to the Debtor commencing in February of 1999.

The issue is whether the parties intended for the difference to constitute a "contingency" fee that was due and payable only upon the occurrence of a specified event, or whether the parties intended the difference to constitute a "deferred" fee that was owed immediately upon the performance of the service, but payable on some date in the future.

### A. The nature of the agreement

The Debtor asserts that the difference was a contingency fee. According to the Debtor, the fee was contingent upon the

successful recovery of assets for the family businesses, and that no fee was owed unless the contingency was satisfied. The Debtor testified that the agreement was reached with Merkle as follows:

A: He said that if we fail and we don't—and nothing happens and we don't recover anything, then you guys don't have to pay us. And he said that's how confident he felt where we were and where we were going forward.

 . . . . .

A: But it was my understanding we were taking over the entities. They came with a set of books, okay? We knew that beyond whatever books we were given that there were other assets. That's what we were going to be after, okay? That would involve some litigation.

And if we could not get assets beyond what we were hopefully given on the books, then that's it. Then we just pay the bare-bones rate, but he felt good one way or another that we would recover assets. And at that point that we recovered assets beyond what was on the books, then we would pay what was deferred.

(Transcript, pp. 182–83). In other words, the fees were contingent upon the completion of the process and the receipt of assets, "whichever way that was going to happen." (Transcript, p. 165).

The Law Firm contends, on the other hand, that the fee was due at the full hourly rate as of the date that the legal services were performed, but that payment of the fee in excess of $90 per hour was deferred until the Debtor was financially able to pay the difference. Magri testified that the agreement was as follows:

A: We ultimately ended up in an agreement where we agreed to bill them $90 an hour on a current basis. The actual bill would be for—or the arrangement would be for our full hourly rates but we would defer the difference between the $90 rate and the full hourly rate until a point when they were able to pay.

(Transcript, pp. 34–35). With respect to the New Case Memo, Magri testified that the document reflected that the "full rate difference" was owed, and that "the only contingency would be that they'd pay us when they're able to pay us.... All that means is that we're not going to get paid the full rate difference until they're able to pay." (Transcript, pp. 142, 144). According to the Law Firm, therefore, the only contingency in the agreement related to when they would get paid, not whether the fees were owed.

The Court is satisfied that both parties entered the agreement in good faith, and that neither party anticipated the final outcome of the engagement. It appears that both parties entered the oral contract with the expectation that significant assets would be recovered for the family businesses, and that sufficient funds would therefore be available for payment of the fees. (Transcript, pp. 132, 190). Apparently neither party contemplated the failure of their efforts.

After considering all of the exhibits and testimony, the Court concludes that the Law Firm's fees were owed at the attorneys' full hourly rates as of the date that the legal services were rendered. The parties' verbal agreement provided only that collection of the fees would be deferred until the Debtor and Kent Ellsworth were financially able to pay the full amount charged. The fees were not contingent upon the successful outcome of the representation.

The Court reaches this conclusion for at least two separate reasons.

First, the Law Firm had expressly rejected the Debtor's request that the arrangement be structured as a contingency fee agreement. In August of 1998, the Debtor and his brother were not financially able to fund the legal battle necessary to obtain their "fair share" of the family businesses. (Transcript, pp. 178, 201–02). Consequently, the Debtor and Kent Ellsworth specifically asked Merkle and the Law Firm to accept the representation under a contingency fee arrangement, with the fees to be based on a percentage of the recovery. (Transcript, pp. 178, 199).

The Debtor acknowledges that the Law Firm rejected the request. (Transcript, pp. 163, 199). Additionally, Magri testified that the Law Firm refused to agree to the Debtor's request because the firm did not take complex commercial cases on a contingency basis as a matter of policy. (Transcript, pp. 33–34).

It is clear from the record that the Law Firm never agreed to a contingency fee agreement based on a percentage of the amount recovered, and there is no evidence to suggest that the Law Firm would have agreed to an alternate contingency arrangement for its full hourly rate. In fact, since both parties expected that significant assets would be recovered, and since the Law Firm would not agree to a contingency fee based on the amount recovered, it is reasonable that the Law Firm would not agree to a contingency fee that was limited to their normal hourly rates.

Second, the scope and purpose of the engagement was admittedly vague and ill-defined.

The Debtor testified, for example, that his broad objective in hiring the Law Firm was to "marshal the assets" of various businesses so that he could obtain his share of the family wealth. (Transcript, pp. 163, 198). The Debtor also testified, however, that the representation was multi-faceted and included other purposes as well, such as learning the extent of any legal exposure that he might have as a result of his father's actions. (Transcript, p. 198). Further, in the Debtor's view, the engagement was expandable, and allowed the Law Firm to also represent other family members and corporations that might be helpful in the firm's effort to locate assets. (Transcript, p. 198). The Law Firm's Exhibits 3 and 4 corroborate the Debtor's understanding of the open-ended representation. Those exhibits include certain correspondence to the Law Firm in which the Debtor requested that the Law Firm work on a wide range of real property, corporate, and confidentiality issues.

Magri's testimony also shows that the terms of the representation were very loosely structured. Magri repeatedly testified that the case was extremely unfocused in its early stages. According to Magri, for example, the Law Firm could not initially determine whether the case would eventually involve litigation, what the likely outcome of any such litigation might be, or whether the Law Firm would be able to reach any assets. (Transcript, pp. 58–59). No particular litigation was discussed at the outset of the representation. (Transcript, pp. 31–32). The scope of the Law Firm's work was "amorphous," and dependent on future dealings and the cooperation of various third parties. (Transcript, p. 84). The engagement did not cover specific tasks or assignments. "It was for this relationship. And the relationship could include a whole bunch of things." (Transcript, pp. 114–15).

The scope of the representation was poorly defined at the time that the Debtor and the Law Firm entered the verbal fee agreement. Under these circumstances, the Court finds that the Law Firm did not agree to a contingency arrangement pur-

suant to which its fees would only be payable at the full rate in the event of a "successful" outcome. The Court is persuaded by Magri's testimony that the Law Firm would have considered it "nonsensical" to accept a case on a contingency basis where the specific issues and tasks had not been determined at the time that the representation was undertaken. (Transcript, pp. 130–31).

The Court concludes that fees were not contingent upon the successful outcome of the representation.

## B. "Able to pay"

 The Law Firm's fees were owed at the attorneys' full hourly rate as of the date that the legal services were performed. The Law Firm agreed to defer payment of the difference between the full rate and $90 per hour, however, until the Debtor was "able to pay" the entire amount of the charges. (Transcript, pp. 34–35, 131, 142, 144). "We ultimately ended up in an agreement where we agreed to bill them $90 an hour on a current basis. The actual bill would be for—or the arrangement would be for our full hourly rates but we would defer the difference between the $90 rate and the full hourly rate until a point when they were able to pay." (Transcript, pp. 34–35).

The next issue, therefore, is whether the fees based on the Law Firm's full hourly rates are presently due and payable in accordance with the terms of their contract.

Rule 4–1.5(d) of the Rules Regulating The Florida Bar provides that agreements for attorney's fees are generally enforceable according to their terms, unless they are determined to be illegal, obtained through improper solicitation, clearly excessive, or otherwise prohibited by the Rule.

In this case, the agreement provided that the Debtor would pay the deferred fees when he was financially able to pay the full amount of the charges. Magri testified that the Debtor and the Law Firm were to decide jointly when the deferred fees were payable under the agreement. (Transcript, pp. 131–32).

 Contracts providing for payment at an indefinite time in the future are enforceable under Florida law.

> The agreement may be ambiguous as to the time for payment, but it is unambiguous as to the obligation for payment. Simply because a contract is unclear as to when payment must be made does not relieve a party of an obligation to make payment. Where an agreement does not specify the time for payment or provides for an indeterminate or indefinite time, the law implies that payment will be made *within a reasonable time*.

*Independent Mortgage and Finance v. Deater*, 814 So.2d 1224, 1225 (Fla. 3d DCA 2002)(Emphasis supplied).

The general rule set forth in *Deater* has been specifically applied to a contract for attorney's fees. In *Hatcher v. Miller*, 427 So.2d 1039 (Fla. 1st DCA 1983), the client asserted that he and his attorney had agreed that the legal fees at issue would not be due until the client "was better able to pay." *Hatcher v. Miller*, 427 So.2d at 1040. The Court found that the fees were due and owing, because "when no time or an indeterminate or indefinite time is specified for the performance of an act, the law implies that such act will be performed within a reasonable time." *Id.* at 1040(citing *Doolittle v. Fruehauf Corporation*, 332 So.2d 107 (Fla. 1st DCA 1976)).

In this case, the majority of the Law Firm's services were provided prior to November of 1999, when the last regular monthly bill was sent to the Debtor. Services on a much smaller scale were per-

formed periodically thereafter until December 11, 2001, and the last statement was sent to the Debtor on January 25, 2002. The Law Firm's claim does not include any fees for services performed after December 11, 2001.

The Debtor filed this petition under Chapter 11 of the Bankruptcy Code on February 15, 2002, and filed his Amended Plan of Reorganization on June 5, 2003. (Doc. 157). The Plan provided that unsecured creditors would be paid one hundred percent (100%) of their allowed claims, plus interest at the rate of 6% per annum, within 120 days of the effective date of the Plan. The Plan was confirmed on December 8, 2003, and the Order confirming the Plan specifically found that the Plan was "feasible" within the meaning of § 1129(a)(11) of the Bankruptcy Code. (Doc. 181). On March 17, 2005, the Debtor filed his Motion for Final Decree and Affidavit of Substantial Consummation of the Plan. (Doc. 258).

More than three years have passed since the Law Firm performed any services for the Debtor, and the Debtor has now successfully reorganized under Chapter 11. Under these circumstances, the Court finds that the Debtor is able to pay the fees, has received a "reasonable time" to pay the fees, and that the fees are now due pursuant to the oral agreement.

## C. The corporations

Finally, the Debtor asserted at trial that he is not obligated to pay the fees because the services were rendered primarily to the Debtor's closely-held corporations, and not to the Debtor individually. He also asserts that he is not obligated to pay the fees because the Law Firm did not fully disclose its relationship with him in its application to be employed as special counsel for the corporations.

Neither of these assertions, of course, was raised in the Debtor's written Objection to the Law Firm's claim filed on April 5, 2004. (Doc. 199). "An objection to the allowance of a claim shall be in writing and filed." Fed.R.Bankr.P. 3007(Emphasis supplied).

The Court finds that the contentions are without merit, however, even apart from their omission from the written pleadings.

First, Magri acknowledged that the majority of the services reflected on the Proof of Claim were performed for the Debtor's separate corporations, and not for the Debtor individually. (Transcript, pp. 104, 115–16).

There is no evidence, however, that the corporations objected to payment of the fees by the Debtor, and it is clear that the Debtor consented to the Law Firm's representation of his corporations. As of October of 1998, for example, the Debtor had retained Dennis Alfonso to represent him individually, and understood that the Law Firm was primarily representing the corporations at that point. In fact, to the extent that the Debtor sought advice from the Law Firm after October of 1998, he knew that he was seeking such advice on behalf of the corporations. (Transcript, pp. 169, 170–71).

Further, and perhaps more importantly, it is also clear that the Debtor and his brother expressly agreed to pay the fees incurred by the Law Firm in its efforts to recover assets for the family businesses. According to the Debtor, he understood at the time that he hired the Law Firm that he was agreeing to pay for the representation of the corporations and "whoever else" was necessary for the recovery of assets. (Transcript, p. 198).

The Debtor is not released from his contractual obligation to pay the fees on the basis that the legal services were pro-

vided to the Debtor's corporations, and not to the Debtor individually.

■ Second, the Debtor's obligation to pay the fees is not negated because of the statements made by the Law Firm in its application to be employed as special counsel in the corporate bankruptcy cases. In the Affidavit of Proposed Special Counsel, Merkle and Magri attested as follows:

> We have no connection with [the debtor corporation], the above-named Debtor, its creditors, or any other party in interest herein or its respective attorneys, *except prior to the bankruptcy filing, my firm represented Walter-William Investment Co., Imperial Realty & Development Co., and W/W Citrus Co., Michelle E. Badcock, Suzanne M. Ellsworth, W. Wm. Ellsworth, III, and Kent C. Ellsworth.*

(Debtor's Exhibit 4)(Emphasis supplied). The Debtor asserts that the Affidavit disclosed only the Law Firm's prepetition representation of the Debtor (an insider of the corporate debtor), and did not specifically disclose the continuing, postpetition arrangement between the parties. The Debtor cites *In re Keller Financial Services of Florida, Inc.*, 248 B.R. 859 (Bankr. M.D.Fla.2000) for the proposition that the Law Firm should be ordered to forfeit its fees as a result of the nondisclosure.

Rule 2014 of the Federal Rules of Bankruptcy Procedure, of course, requires attorneys representing a bankruptcy estate to disclose all arrangements for compensation and all connections with the debtor, creditors, and other parties in interest. Fed.R.Bankr.P.2014. See also 11 U.S.C. § 329(a). The gravity of the disclosure requirements under the Code and Rules is well-established.

The nondisclosures in *Keller*, however, differ significantly from the situation in this case. The attorney in *Keller* was an experienced bankruptcy practitioner who was very familiar with the duty of disclosure. Further, in *Keller*, it was clear that the attorney had taken various actions in the case that were influenced by the undisclosed connections with the Debtor's insiders. *In re Keller Financial Services of Florida, Inc.*, 248 B.R. at 903. Additionally, the Court in *Keller* specifically found that the nondisclosures were not the result of inadvertence, but were instead the result of a purposeful calculation. *Id.* at 886.

In the case at bar, on the other hand, neither Merkle nor Magri were regular bankruptcy practitioners, and did not prepare the Affidavit that was filed in support of their application for employment. (Transcript, pp. 108–09). Magri testified that he believed that the Affidavit contained all of the information that was required, and the Court is satisfied that the error was not intentional. (Transcript, p. 109). Finally, the representation is now complete, and no adverse interest or improper conduct by the Law Firm has been discovered. See *In re National Liquidators, Inc.*, 182 B.R. 186 (S.D.Ohio 1995).

The Law Firm's claim should not be disallowed on the basis of the statements made in its application for employment as special counsel in the corporate Chapter 11 cases.

## Conclusion

The primary issue in this case is whether the oral agreement between the Law Firm and the Debtor constituted a contingency fee arrangement, or whether it constituted an agreement to defer collection of a portion of the fees until an indefinite date in the future.

The Court finds that the Law Firm's fees were owed at the attorneys' full hourly rates as of the date that the legal services were performed. The parties' verbal agreement provided only that the collection of the fees would be deferred until the

Debtor and Kent Ellsworth were financially able to pay the full amount charged. The Court reaches this conclusion in part because the evidence shows that the Law Firm expressly rejected a contingency arrangement proposed by the Debtor, and in part because a contingency arrangement would have been impractical given the vague and poorly defined scope of the engagement.

The Court also finds that the fees are currently due and payable, because the Debtor is able to pay and a "reasonable time" has passed since the debt was incurred.

Finally, the Court finds that the Debtor is obligated to pay the fees even though a majority of the services were provided to his corporations, and not to the Debtor individually, and even though the Law Firm did not fully disclose its continuing relationship with the Debtor in the corporate cases. The circumstances surrounding the nondisclosure do not warrant forfeiture of the fees, and the agreement should be enforced according to its terms.

Accordingly:

**IT IS ORDERED** that:

1. The Objection to Claim No. 12 of Merkle & Magri, P.A. filed by the Debtor, W. William Ellsworth, III, is overruled.

2. Claim Number 12 of Merkle & Magri, P.A. is allowed as filed in the amount of $42,865.50.